**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Glenn Arthur McCLINTIC, Jr.,
Defendant-Appellant.**

**No. 77–1174.**

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 10, 1977.

Decided Jan. 13, 1978.

---

Michael H. Irvine, Cedar Rapids, Iowa, for defendant-appellant.

Evan L. Hultman, U. S. Atty. (on brief), and Robert L. Sikma, Asst. U. S. Atty. (argued), Sioux City, Iowa, for plaintiff-appellee.

Before HEANEY and BRIGHT, Circuit Judges, and TALBOT SMITH,* Senior District Judge.

TALBOT SMITH, Senior District Judge.

The defendant appeals from a jury verdict of guilty on five counts of a six-count indictment. We affirm.

Count I charged the defendant, Scott Voeltz, and Robert Braumann with violating 18 U.S.C. § 371 by conspiring to commit wire and mail fraud, and interstate transportation and receiving of stolen property, in violation of 18 U.S.C. §§ 1341, 1343, 2314, and 2315. Counts II, III, and V charged the defendant with receiving stolen property transported in interstate commerce in violation of 18 U.S.C. §§ 2 and 2315. Count IV charged the defendant with interstate transportation of stolen property in violation of 18 U.S.C. §§ 2 and 2314. The jury acquitted the defendant of the sixth count, which charged an extortionate extension of credit in violation of 18 U.S.C. § 892. The defendant was sentenced to five years imprisonment on count I and ten years on count II, to run concurrently. He was sentenced to ten years imprisonment on count III, to run consecutively to the terms on counts I and II. He received prison terms of ten years on each of counts IV and V, to run concurrently with counts I, II, and III.

After filing notice of appeal, defendant filed a motion for a new trial on the ground of newly discovered evidence. This Court remanded to the District Court [1] for disposition and defendant's motion was subsequently denied. On appeal, the defendant challenges the adequacy of the indictment, the trial court's refusal to sever counts I, II, and III from counts IV and V, several evidentiary rulings, and the denial of his new trial motion based on newly discovered evidence.

Counts I, II and III arise out of the defendant's involvement in the so-called Mount Vernon scheme. Pursuant to this scheme the defendant initially loaned money to Susan Dvorak. She in turn transferred part of the money to Scott Voeltz and Robert Braumann to operate a food concession in Florida. Unable to collect the loan from Ms. Dvorak, the defendant attempted to collect directly from Voeltz and Braumann, without success. Agreeing that they could pay in merchandise, Voeltz and Braumann, with defendant's knowledge, operated two business fronts, Star Sales and Mount Vernon Sales, on premises in Mount Vernon, Iowa. Using false financial statements and alternating their "companies" as credit references, they placed orders by mail and telephone with a variety of wholesale suppliers. When the suppliers checked the "references" by telephone, the false information was confirmed. Quick Products, a local sales company owned by the defendant and his brother, was also used as a credit reference; false credit reference confirmations were provided through the cooperation of the defendant and Timothy Morrissey, a Quick Products employee.

When Voeltz and Braumann received merchandise in late May, 1975, the defendant took items valued at about $14,000 in repayment of the loan and sold them in his own name. Morrissey helped transfer the goods to the defendant's residence. When the initial sales of the merchandise did not satisfy the defendant, he returned to Voeltz, who furnished him with more merchandise later in June, 1975.

Counts IV and V arise out of the defendant's involvement in the so-called "Paper Place" scheme in Denver, Colorado. In August or early September, 1975, Morrissey approached the defendant with an outline

---

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

1. The Honorable Edward J. McManus, Chief United States District Judge for the Northern District of Iowa.

for a novel which Morrissey had entitled "Paper Place." The outline detailed a check-kiting scheme in which persons would set up a bogus company and open bank accounts using false documents and identification. Payroll checks written on the accounts would be cashed in supermarkets and retail stores on a weekend, while the banks were closed; the rest of the scheme would be closed up by the end of the weekend. After discussion of the scheme, the defendant loaned money to Morrissey to try the plan out in Minnesota. This attempt, and another, executed in Salt Lake City and similarly financed by a loan from defendant, were economically unsuccessful.

Anxious to pay back his loans, Morrissey met with defendant later in September and discussed a trip to execute the Paper Place scheme in Denver. Defendant again loaned money to Morrissey to finance the trip. The operation of the Denver scheme was successful, netting several thousand dollars worth of merchandise, which Morrissey and an accomplice brought back to Iowa for resale.

Morrissey and his accomplice removed some of the serial numbers from the goods and shortly thereafter, the defendant and Morrissey began to sell the merchandise locally, for cash. They were unsuccessful in recouping the amount of the loans outstanding to Morrissey, so a few weeks later, the Paper Place scheme was attempted in Rockford, Illinois, at defendant's suggestion. After two or three days in Rockford, the sham was detected, and Morrissey and his accomplices were arrested. Defendant McClintic was apprehended later.

## I

Defendant contends that the trial court erred by refusing to dismiss counts II, III, and V of the indictment as fatally defective for failing to charge a violation of 18 U.S.C. § 2315.[2] Defendant complains that by charging him with receipt of stolen merchandise which he knew "to have been stolen, unlawfully converted and taken by *fraud*," (emphasis supplied), counts II, III, and V added an element not contained in the statute. The defendant argues that the addition of this descriptive element had the effect of charging acts which are not proscribed by 18 U.S.C. § 2315.

The defendant's argument is defective in three particulars. First, the addition of the descriptive element did not mislead the accused; rather it merely described in greater detail "the elements of the offense charged and fairly inform[ed] [him] of the charge against which he must defend." *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974).

Second, the accepted construction of the term "stolen," as used in the present codification of the National Stolen Property Act, 18 U.S.C. §§ 2314 and 2315, as well as the "Dyer Act,"[3] includes "all felonious takings . . . with intent to deprive the owner of the rights and benefits of ownership, regardless of whether or not the theft constitutes common-law larceny." *United States v. Turley,* 352 U.S. 407, 417, 77 S.Ct. 397, 402, 1 L.Ed.2d 430 (1957). *See also United States v. Frakes,* 563 F.2d 803, 805 (6th Cir. 1977); *United States v. McClain,* 545 F.2d 988, 995 (5 Cir. 1977); *Lyda v. United States,* 279 F.2d 461, 464 (5th Cir. 1960); *Bergman v. United States,* 253 F.2d 933, 935 (6th Cir. 1958). A taking "by fraud," fits accurately within the expansive definition of "stolen" above.

Third, the legislative history of 18 U.S.C. § 2315 shows that the type of taking referred to in the scienter clause was a *taking*

---

**2.** 18 U.S.C. § 2315 provides in relevant part:

Whoever receives, conceals, stores, barters, sells, or disposes of any goods, wares or merchandise, securities, or money of the value of $5,000 or more, or pledges or accepts as security for a loan any goods, wares, or merchandise, or securities, of the value of $500 or more, moving as, or which are a part of, or which constitute interstate or foreign commerce, *knowing the same to have been stolen, unlawfully converted, or taken;*

\* \* \* \* \* \*

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both. (Emphasis supplied.)

**3.** The Dyer Act, 18 U.S.C. § 2312, prohibits the interstate transportation of "stolen" vehicles.

*by fraud.* Section 4 of the National Stolen Property Act, ch. 333, 48 Stat. 795 (1934), the precursor to 18 U.S.C. § 2315, provided originally as follows:

> Whoever shall receive, conceal, store, barter, sell, or dispose of any goods, wares, or merchandise, securities, or money, of the value of $5,000 or more, or whoever shall pledge or accept as security for a loan any goods, wares, or merchandise, or securities of the value of $500 or more which, while moving in or constituting a part of interstate or foreign commerce, *has been stolen or taken feloniously by fraud or with intent to steal or purloin, knowing the same to have been stolen or taken,* shall be punished by a fine of not more than $10,000 or by imprisonment of not more than ten years, or both. (Emphasis supplied.)

Subsequent simplifying amendments of this language in later codifications reveal no hint that Congress thereby intended to restrict the statute's reach. We agree with the Fifth Circuit in *Lyda v. United States, supra,* that the class of deprivations of property which Congress sought to prohibit in the National Stolen Property Act includes "a forcible taking or a taking without . . . permission, by false pretense, by fraud, by swindling, or by a conversion by one rightfully in possession." 279 F.2d at 464. The indictment accurately spelled out the elements of the offense charged.

## II

The defendant claims that the trial court erred by refusing to sever counts I, II, and III, relating to the Mount Vernon scheme, from counts IV and V, relating to the Paper Place scheme. He argues that the Mount Vernon and Paper Place schemes were dissimilar in character and that the jury was prejudicially swayed by the accumulated evidence against him.

Fed.R.Crim.P. 8(a) permits joinder of offenses if "the offenses charged . . . are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." Rule 14 permits severance to avoid undue prejudice. Where the offenses are similar in character and occurred over a relatively short period of time and the evidence overlaps, joinder is ordinarily appropriate. *United States v. Riley,* 530 F.2d 767, 770 (8th Cir. 1976), *United States v. Hoog,* 504 F.2d 45, 49 (8th Cir. 1974), *cert. denied,* 420 U.S. 961, 95 S.Ct. 1349, 43 L.Ed.2d 437 (1975). The trial court has a wide range of discretion in matters of severance, and we reverse only upon a finding of clear prejudice and abuse of discretion. *United States v. Lewis,* 547 F.2d 1030, 1033 (8th Cir. 1976), *cert. denied,* 429 U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 566 (1977). *United States v. Riley, supra; United States v. Chrisco,* 493 F.2d 232, 239 (8th Cir. 1974), *cert. denied,* 419 U.S. 847, 95 S.Ct. 84, 42 L.Ed.2d 77 (1974); *United States v. Simon,* 453 F.2d 111, 114 (8th Cir. 1971). Here, the defendant participated in each scheme in a nearly identical manner:— that is, by receipt and sale of fraudulently obtained merchandise as payment on a previous loan. While Voeltz and Braumann did not participate in the second scheme, McClintic's involvement in both smoothly shifted from sales of the Mount Vernon goods to financing the Paper Place operations. No abuse of discretion has been shown. Defendant's contention that joinder allowed the jury to impermissibly pool incriminating evidence against him is belied by his acquittal of count VI.

## III

Timothy Morrissey was the principal government witness concerning the Paper Place scheme. He testified that although he and McClintic had discussed the scheme prior to his Denver trip, he did not explain to the defendant after the trip how the goods had been obtained. The government then elicited over the defendant's objection Morrissey's opinion that McClintic knew that the Denver merchandise had been fraudulently obtained. Defendant now

claims that this testimony went beyond the proper bounds for a lay witness' opinion and could not have been rationally based on the perceptions of the witness.

Rule 701 of the Federal Rules of Evidence limits the opinions of a lay witness to "those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." Defendant does not contest that the opinion of the person closest to McClintic during the planning of the Denver scheme and its aftermath would be helpful in determining whether or not the defendant knew that the goods were obtained by fraud. Rather, defendant disputes the basis for the witness' opinion.

Here the basis seems ample. In the first place there had been a full discussion between defendant and Morrissey of the details of operation of the Paper Place scheme, which was employed in Denver. Moreover, defendant's actions in negotiating cash sales of the fraudulently obtained goods soon after Morrissey returned from Denver were fully consistent with the implementation of the theretofore discussed scheme. Morrissey's opinion that the defendant fully understood how the goods had been obtained was rationally based upon his perceptions, and his opinion was proper as "a shorthand rendition of [the witness'] knowledge of the total situation and the collective facts." *United States v. Freeman*, 514 F.2d 1184, 1191 (10th Cir. 1975).

The trial court did not abuse its discretion by permitting this testimony.

## IV

The defendant, testifying in his own behalf, asserted that the first time in his life when he had done anything illegal was when he participated in organizing the Paper Place scheme in Rockford, Illinois. On cross-examination, however, the prosecutor inquired into the defendant's attempt in 1973 to sell a two-hundred dollar ring for $8,000. The buyer had been in reality an FBI agent, and the attempted swindle had resulted in a change in the defendant's then-current terms of probation.[4] The trial court ruled, over objection, that this inquiry was proper cross-examination. Defendant argues that it unfairly prejudiced him by presenting prior criminal acts which bore no relation to the issues at trial. We disagree.

Inquiry into the defendant's prior act of misconduct is justified on two grounds. First, McClintic's attempt to swindle the ring buyer was an act of deception that reflected upon his character for truthfulness and as such, was properly subject to inquiry during cross-examination under Fed.R.Evid. 608(b).[5] *United States v. Brown*, 547 F.2d 438 (8th Cir. 1977), *cert. denied sub nom., Hendrix v. United States*, 430 U.S. 937, 97 S.Ct. 1566, 51 L.Ed.2d 784 (1977). Admissibility of prior misconduct

---

**4.** The defendant had testified on direct examination that in 1972 he had been indicted for his involvement in an alleged scheme to defraud a vending machine company. Those charges were resolved by a plea bargain: defendant pled guilty to three counts of mail fraud in exchange for a sentence of three years on probation and dismissal of 30 other counts of the indictment.

During defendant's cross-examination, only the true identity of the ring buyer was revealed to the jury; the effect of the incident on the defendant's probation was not.

**5.** Fed.R.Evid. 608(b) provides:

Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of

crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of *truthfulness or untruthfulness,* be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

The giving of testimony, whether by an accused or by any other witness, does not operate as a waiver of his privilege against self-incrimination *when examined with respect to matters which relate only to credibility.*

which is probative of a witness' truthfulness is expressly entrusted to the trial court's discretion by Rule 608(b). This incident was not remote in time from the trial,[6] its nature made it probative of the defendant's untruthfulness, and the prejudicial aspects of its effect on the defendant's probationary status were not exposed to the jury. We cannot say that the danger of unfair prejudice, confusion of issues or misleading the jury so substantially outweighed the evidence's probative value that its admission was an abuse of discretion under Fed. R.Evid. 403.[7]

Moreover, the ring-swindle cross-examination was proper as impeachment by contradiction. C. McCormick, *McCormick on Evidence* § 47 at 97 (2d ed. 1972). By painting a picture of himself as an innocent who succumbed to sympathy for Morrissey in the Rockford, Illinois scheme, the defendant invited cross-examination concerning this previous misconduct.[8]

We find no abuse of discretion in the rulings made.

## V

Finally we consider the motion for a new trial. Defendant's co-conspirators Voeltz and Braumann were the government's principal witnesses in the Mount Vernon scheme. Both had struck plea bargains before testifying but not all of the terms had been reduced to writing in the government's memoranda thereof. Defense counsel had used the memoranda during cross-examination but they were not admitted as exhibits on the ground that they were merely cumulative. After defendant's conviction the terms of the bargain made were the subject of lengthy controversy, as well as evidentiary hearings, and based upon the evidence there developed, a motion for new trial on the grounds of newly discovered evidence was made. The denial of this motion is asserted as error.

The version of the bargain that had gone before the jury was that, in return for the testimony of Voeltz and Braumann, the government would recommend probation as to Braumann and "recommend and bind itself" to probation for Voeltz.[9] But it finally developed, from the evidentiary hearings, and it was conceded by the government, that the bargain actually made involved the unusual commitment by the government that if the Court did not acquiesce in probation all charges would be dismissed.[10]

Initially Braumann was put on probation but probation was refused as to Voeltz. After a series of legal maneuvers which we need not recite, the case was transferred to Judge Hanson and Voeltz eventually re-

---

6. An incident's remoteness in time is no longer an explicit factor under Rule 608(b). *See*, H.R. Rep. 93–650, 93d Cong., 1st Sess., U.S.Code Cong. & Admin.News 1974, p. 7051; *United States v. Burch*, 490 F.2d 1300, 1302 n.1 (8th Cir. 1974), *cert. denied*, 416 U.S. 990, 94 S.Ct. 2400, 40 L.Ed.2d 769 (1974). Nevertheless, remoteness in time remains a consideration relevant to the evidence's probative value.

7. *See*, Advisory Committee's note to Proposed Rule 608, Subdivision (b).

8. *United States v. Glasser*, 443 F.2d 994, 1002 (2d Cir. 1971), *cert. denied*, 404 U.S. 854, 92 S.Ct. 96, 30 L.Ed.2d 95 (1971); *United States v. Reddington*, 433 F.2d 997, 998 (4th Cir. 1970). *See also United States v. Batts*, 558 F.2d 513 (9th Cir. 1977) (allowing-extrinsic evidence to contradict the defendant's assertion that he was naive in drug matters).

9. On direct examination the following testimony was elicited by prosecutor Robert Sikma from codefendants Braumann and Voeltz:

*Braumann*

Q. What is that agreement, the best of your understanding?

A. If I cooperate and plead guilty to one count and the Government recommends probation.

*Voeltz*

Q. You have been also told that the Government will agree to recommend and bind itself to a sentence of probation in this case. Is that correct?

A. That is correct.

10. This was specifically applicable to Voeltz (Tr. p. 10, Hearing on Government's Motion to Dismiss Indictment) and, according to Braumann's counsel, (Tr. pp. 20 and 21, Hearing on Plea and Sentencing) also to him.

ceived probation.[11] Thus each codefendant has received the benefit of his bargain.

The issue argued by defendant is a narrow one, namely that the defendant is entitled to a new trial on the ground that the lenient term of the plea agreement, relating to dismissal of the charges, was placed before neither the court nor jury, and that the trial court erred in denying the motion for new trial. The government, per contra, urges that the jury was well aware that, because of their plea bargains, the codefendants were not to suffer incarceration, and whether their freedom resulted from grant of probation or dismissal of charges the end result was the same, namely, that under no circumstance would either codefendant "serve time."

There is no doubt that the essential terms of a plea bargain, once reached, must be honored by the prosecution, *Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971).

Rudimentary demands of a fair trial also require that the terms of a plea bargain reached with a material prosecution witness be disclosed to the judge and jury so that the trier of fact may weigh the witness' credibility. *United States v. Pope*, 529 F.2d 112, 114 (9th Cir. 1976). While this doctrine arose from a series of cases in which witnesses were allowed to perjure themselves as to agreements made, either through inadvertence or design,[12] it also encompasses situations in which the government allows materially misleading statements to go uncorrected. *United States v. Harris*, 498 F.2d 1164, 1169 (3d Cir. 1974), *cert. denied*, 419 U.S. 1069, 95 S.Ct. 655, 42 L.Ed.2d 665 (1974).[13] In this case, the government inexcusably neglected to correct the misleading impression made by the memoranda of negotiated pleas and to fully and accurately disclose the true nature of the plea bargain.

But in order to justify a new trial we must weigh the reasonable impact of the omitted evidence on the jury verdict. As the Supreme Court held in *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972):[14]

> We do not, however, automatically require a new trial whenever "a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict. . . ." *United States v. Keogh*, 391 F.2d 138, 148 (CA2 1968). A finding of materiality of the evidence is required under *Brady, supra*, at 87.[15] A

**11.** So we were informed, and without denial, upon oral argument.

**12.** *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) extended *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) to nondisclosures "whether the . . . the result of negligence or design." *Giglio v. United States*, 405 U.S. at 154, 92 S.Ct. at 766. *See also United States v. Sutton*, 542 F.2d 1239, 1241 (4th Cir. 1976); *Boone v. Paderick*, 541 F.2d 447, 450–51 (4th Cir. 1976), *cert. denied*, 430 U.S. 959, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977).

**13.** We do not believe, however, that the prosecution's duty to disclose false testimony by one of its witnesses is to be narrowly and technically limited to those situations where the prosecutor knows that the witness is guilty of the crime of perjury. Regardless of the lack of intent to lie on the part of the witness, *Giglio* and *Napue* require that the prosecutor apprise the court when he knows that his witness is giving testimony that is substantially misleading. This is not to say that the prosecutor must play the role of defense counsel, and ferret out ambiguities in his witness' responses on cross-examination. However, when it should be obvious to the Government that the witness' answer, although made in good faith, is untrue, the Government's obligation to correct that statement is as compelling as it is in a situation where the Government knows that the witness is intentionally committing perjury. *United States v. Harris*, 498 F.2d 1164, 1169 (3d Cir. 1974).

**14.** The *Giglio* standard has been recently reconfirmed by the Supreme Court in *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) as it has been applied to conduct which may have corrupted the truth-finding process. *See United States v. Sutton*, 542 F.2d 1239, 1241 (4th Cir. 1976).

**15.** *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

new trial is required if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury. . . ." *Napue, supra,* 360 U.S. at 271, 79 S.Ct. 1173.[16] (Footnotes ours.)

Here the proviso not brought to the attention of court and jury[17] could not, in any reasonable likelihood, have affected the judgment of the jury. It was made clear to the jury that neither Voeltz nor Braumann would suffer incarceration as a result of their bargain.[18] The fact that their freedom would result from a grant of probation rather than a dismissal of the charges might have a legal significance as to some situations but it would not, in our judgment, and that of the trial court, be so additionally persuasive to a jury on the issue of credibility, and thus ultimately on the issue of defendant's guilt or innocence, that a new trial should result. We find no error in the court's denial of the motion for new trial.

The judgment of the trial court is affirmed.

16. *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

17. The situation arose, according to the prosecutor, by reason of a clerical mishap in his office. A careful examination of all references in the transcripts to the plea bargain discloses no hint of bad faith. The final arguments were not reported; hence we have been unable to make an examination thereof. But no signifi-cant charges with respect thereto are presented by the appellant.

18. In this case, it is not claimed that the prosecutor exacerbated the situation by improper and misleading argument. *Cf., United States v. Gerard,* 491 F.2d 1300 (9th Cir. 1974); *Boone v. Paderick,* 541 F.2d 447 (4th Cir. 1976), *cert. denied,* 430 U.S. 959, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977).