UNITED STATES of America, Appellee,

v.

**Harry F. REEVES, Appellant.**

UNITED STATES of America, Appellee,

v.

**Ada M. SHAW, Appellant.**

UNITED STATES of America, Appellee,

v.

**Leslie A. LaMONS, Appellant.**

**Nos. 81–1794 to 81–1796.**

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 13, 1982.
Decided April 6, 1982.

David H. Johnson, Riverside, Mo., Thomas F. Hutchison, Nancy R. Bikson, Kansas City, Mo., for appellants.

Robert G. Ulrich, U.S. Atty., Robert E. Larsen, Asst. U.S. Atty., Kansas City, Mo., for plaintiff-appellee.

Before HEANEY, BRIGHT and STEPHENSON,* Circuit Judges.

STEPHENSON, Circuit Judge.

Defendants-appellants Harry Reeves, Ada Shaw and Leslie LaMons appeal from jury verdicts[1] finding them guilty of conspiracy (18 U.S.C. § 371) in causing false representations to be made on loan applications to an FDIC bank in violation of 18 U.S.C. § 1014 and substantive offenses in connection therewith in violation of 18 U.S.C. § 1014 and 2.[2] Appellants contend that the district court erred in refusing to grant a mistrial and in overruling their motions for severance. Further, they argue that the guilty verdicts are not supported by substantial evidence and that requests for a continuance should have been granted. We affirm the district court.

## I. BACKGROUND

The indictment charged that the defendants' scheme to defraud the bank operated over six months, from June 8, 1979 to December 10, 1979. The evidence revealed that the defendants contacted four acquaintances and helped them to fraudulently apply for and receive Title I, FHA Insured Home Improvement Loans. The ap-

---

* The Honorable Roy L. Stephenson assumed senior status on April 1, 1982.

1. The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri, presiding.

2. Defendants were charged in the substantive offenses as follows: Count II, Reeves and LaMons; Count III, Reeves and Klint; Count IV, Reeves and Klint; Count V, Reeves and Shaw. Defendants were convicted on all counts.

The court imposed sentences on Harry Reeves of one year imprisonment on Count II and one year under Count III to run concurrently. The sentences on Counts I, IV and V were suspended with defendant placed on probation for three years beginning upon his release from confinement on the sentences im-

posed under Counts II and III. LaMons received a split sentence of twenty-four months under Count II with confinement of 120 days and the remainder suspended. She was placed on probation for three years to commence upon release from the above period of confinement. The same sentence was imposed under Count I to run concurrently. Ada Shaw received eighteen months under Count V and, under a split sentence, confinement was reduced to a period of ninety days with the balance suspended. This was to be followed by three years of probation. The same split sentence was imposed on Count I to run concurrently.

The fourth defendant in the case, Judy Klint, does not appeal the judgment finding her guilty of the same statutory violations.

plications were made to the First National Bank of Kansas City, a bank insured by the Federal Deposit Insurance Corporation. The four applications falsely stated that the applicant owned the property to be improved and that the loan proceeds would be used to improve the property. After each loan was approved, the bank would issue a check in the name of the applicant. The applicant received a portion of the proceeds and the balance was kept by the defendants for their own use. The four properties were not improved and the loans were not repaid.

Testimony from David Beal supported the government's charges in Count I (conspiracy) and Count II (Beal loan). In July of 1979, Beal became a business associate of Reeves, Klint,[3] Shaw and LaMons in their downtown Kansas City, Missouri, office. Beal testified that all the defendants were involved in Minoco Development Corporation (Minoco) and that the defendants also operated several subsidiary corporations under Minoco.

The defendants were having trouble paying rent and other bills and Beal let them know he was anxious to help if he could. During this time defendant Reeves told Beal that he could help by taking out a Title I FHA loan on some property and that similar loans had been made from time to time to obtain money to pay bills. Reeves said the money would be used to keep Minoco alive. After Beal agreed to help, Reeves called defendant LaMons into his office and told her to go to the filing cabinet and find a piece of property to use. LaMons selected a property file from the cabinet and gave Beal a loan application to complete. She told him to fill out what he could and she would do the rest. LaMons took the application Beal had filled out in pen and later brought over a typewritten copy for him to sign in which she had typed in 2221 Elmwood as the property to be improved. The application falsely stated that Beal had lived at 2221 Elmwood for three months and that he had paid $5,000 for that property in June of 1979.

The application was also false in that it indicated that Beal was employed by All-Steel Products, Inc. (a Minoco subsidiary) at the salary of $995 per month and that he had been employed there for three years. Reeves had told Beal to indicate that he worked for All-Steel and LaMons and Beal had discussed how much money per month should be listed as salary to secure the loan and had also discussed what should be entered as the length of time Beal had been employed by All-Steel. LaMons told Beal that if the bank called to verify that information, she would verify it and represent herself as the personnel director for All-Steel.

Beal looked over the application typed by LaMons and signed it. Later that day Beal's wife also signed the application after defendants Reeves, Shaw and LaMons told her that the loan would help Minoco stay alive and after Reeves indicated that she would not have to make loan payments, Minoco would handle the payments.

The next day LaMons and Beal prepared the rest of the loan package and submitted it to the bank. LaMons had Beal sign a construction bid, a carpeting bid and a warranty deed. LaMons forged Mrs. Beal's signature on the warranty deed and also notarized the deed.

The bank called the Minoco offices, LaMons verified Beal's employment and the bank eventually agreed to give Beal a $6,700 Title I FHA loan. Before applying for the loan, Reeves and Beal had discussed the amount that should be requested and another Minoco associate suggested that the number should total thirteen since thirteen was a lucky number for Minoco. Beal further testified that the $6,700 amount requested was not based on any bids received by the corporation.

After receiving the loan check from the bank, Beal went back to the Minoco offices and began waiving the check around. Defendants Reeves, Shaw and LaMons congratulated him. Reeves and Beal had previously discussed splitting the money and

**3.** *See* n.2 *supra.*

had agreed that Beal would receive $2,800. When Beal actually received the check, Reeves and he discussed what corporation should be used to write Beal a check for his share of the money. Beal signed the check over to the National Business League of Kansas City and Reeves gave Beal a National Business League check for $2,800.

Testimony from Milton Perry also supported the government's charges in Count I (conspiracy) and Count V (Perry loan). He stated that shortly after he met defendant Shaw in the summer of 1979, she contacted him about making a Title I FHA loan application. Shaw brought an application to Perry's apartment and asked him to fill it out. She said that Minoco needed money because it was in financial difficulty and that the money would go back into Minoco. When Shaw returned to pick up the completed application, she told Perry he had made a mistake because he had put down his actual address instead of the address of the property that was the basis for the loan, the 3245 Benton address. When Shaw returned with the typewritten application for his signature, the actual residence was not listed; instead the 3245 Benton address was on the application. Other false information that Perry had not written in was also included. For example, the application falsely stated that Perry had lived at the Benton address for two months. Further, it incorrectly stated that Perry had purchased that property on June 1, 1979, for $15,000. Perry signed the loan application, as well as a construction bid and a certificate of eligibility for carpeting that Shaw presented to him.

Later, Shaw called Perry at work and told him that the money was ready to be picked up. Perry picked up Shaw at the Minoco offices and she told him where to go in the bank. She waited in the car while Perry picked up the check. Immediately after receiving the $7,500 check from the bank, Perry endorsed it to D. S. O. Wood Products (a Minoco subsidiary) and gave it to Shaw.

A few days after turning the check over to defendant Shaw, Perry received an $800 check and $200 in cash from defendant Reeves. Reeves explained that $1,000 was over and above the amount needed to repair the house at 3245 Benton.

Perry received a letter from the bank saying that a payment was due. He went to Minoco's downtown office, walked into Reeves' office, threw the payment book on Reeves' desk and asked who was supposed to make the payments. Reeves said he would make them when Perry could not.

Perry later received an *unsigned* stock certificate for 750 shares of stock in Executive Marketing Enterprises, Inc. from Shaw. Defendants Reeves, Shaw and LaMons all had a discussion with Perry regarding the certificate, which was for stock in a Minoco subsidiary. Perry was under the impression that the stock was given him in return for the $6,500 of the loan that he had turned over to Shaw. However, when he had a conversation with Reeves and Shaw about cashing the certificate in, Reeves told him the money was not available.

In December of 1979, Perry received a copy of a letter from Reeves to a bank officer. The letter stated that Minoco had packaged four FHA Title I loans and that Minoco had made a mistake in filing a warranty deed at the courthouse instead of a real estate contract and deed of trust. Reeves asked to meet with the bank officer to discuss the error and "salvage the credit of these customers." When Reeves and Perry discussed the letter, Reeves said the letter would be a release for Perry and that Perry had nothing to worry about.

The four loans referred to in the letter were from the bank to Beal and Perry, as previously discussed, and also loans to Diane Miller, Count I (conspiracy) and Count IV (Miller loan), and Elizabeth McCauley, Count I (conspiracy) and Count III (McCauley loan). Miller and McCauley were recruited by defendant Klint to complete applications for Title I FHA loans. Their loan arrangements follow the same pattern as the Beal and Perry loans and their testimony supports the government's charges.

Miller was asked if she could use $1,000 by Klint, who told Miller that if she let Minoco use Miller's name to get a loan then Miller would get $1,000 and Minoco would keep the rest. Miller understood that she had no obligation to repay the loan, that all they needed was her name. Miller's loan application falsely stated that she had lived at 3819 Smart for one month, that she was employed by Klint's corporation at $1,300 per month and that she purchased the property on Smart on June 1, 1979, for $3,000. Klint also had Miller sign a construction bid and a certificate for eligibility for carpet. Miller further testified that she had not signed the warranty deed notarized by defendant LaMons and that her name, as signed on the deed, was spelled incorrectly. When the loan was approved, Miller kept $1,000 and Klint received the other $6,500.

McCauley testified that she was in serious financial difficulty when Klint approached her about taking out a Title I loan. McCauley understood that Reeves would supply the piece of property to be used as the basis for the loan and that the loan would be split so that Reeves received $1,000, Klint received $3,000 and she would receive $3,500. McCauley simply signed the completed papers presented to her by Klint. Included among those papers was a certificate for eligibility for carpet and a construction bid. McCauley's loan application falsely stated that she had lived at 3408 Askew for one month and that she bought the Askew property for $9,800 in June of 1979. The application also falsely inflated her salary. McCauley also testified that she had not seen nor signed the warranty deed purportedly containing her signature. That deed was notarized by defendant LaMons.

After a five-day trial, the case was argued and submitted to the jury. The jury returned verdicts of guilty against all four defendants on all charges and the district court entered judgments on those verdicts.

## II. ANALYSIS

### A. *Severance and Mistrial Motions*

Appellants contend that the district court erred in not granting their numerous mo-

tions for severance and mistrial. They argue that severance was necessary because the complexity of the case prevented the jury from considering the evidence on each charge against each individual appellant.

■ Our scope of review is limited and we accord the district court considerable discretion in determining whether or not a severance is warranted. A denial of a motion for severance is not grounds for reversal unless the district court's denial constituted clear prejudice and an abuse of discretion. *United States v. Losing,* 560 F.2d 906, 911 (8th Cir.), *cert. denied,* 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977). In fact, joinder of defendants charged with conspiracy, as these defendants were, is preferred where proof of the charge is based upon the same evidence and acts. *United States v. Brim,* 630 F.2d 1307, 1310 (8th Cir. 1980), *cert. denied,* 452 U.S. 966, 101 S.Ct. 3121, 69 L.Ed.2d 980 (1981); *United States v. Boyd,* 610 F.2d 521, 528 (8th Cir. 1979), *cert. denied,* 444 U.S. 1089, 100 S.Ct. 1052, 62 L.Ed.2d 777 (1980). Severance is required when the proof is such that a jury could not be expected to compartmentalize the evidence as it relates to the separate defendants. *United States v. Losing, supra,* 560 F.2d at 912; *United States v. Jackson,* 549 F.2d 517, 525 (8th Cir.), *cert. denied,* 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379, 431 U.S. 923, 97 S.Ct. 2195, 53 L.Ed.2d 236, 431 U.S. 968, 97 S.Ct. 2928, 53 L.Ed.2d 1064 (1977).

This case lends itself to a logical, compartmentalized analysis. Defendant Reeves is charged in all five counts of the indictment. Count I is the conspiracy count which names all four defendants and the remaining four counts each involve a different loan application. Defendants LaMons, Shaw and Klint each recruited a different loan applicant. Each recruitment was the basis of a different indictment count charging the recruiting defendant and Reeves with making false representations on loan applications to an FDIC bank. Count II involves LaMons' recruitment of Beal, Counts III and IV involve Klint's recruit-

ment of McCauley and Miller and Count V involves Shaw's recruitment of Perry.

■ The prosecution's method of presenting its evidence carefully delineated separate events and occurrences and thus protected against confusion by the jury as to the applicability of the evidence to a particular defendant. Also, compartmentalizing the evidence was enhanced by a joint exhibit submitted to the jury by agreement of all parties. The joint exhibit was a chart which listed the count of the indictment, the date and name of the applicant, the common and legal address of the property involved and the defendants charged on that count. The jury could be expected to compartmentalize the evidence as such evidence related to the separate counts of the indictment dealing with different defendants. The issues were not so complicated as to be beyond the jury's ability to consider the evidence as to the guilt of each defendant independent of the evidence as to the guilt of the other defendants.

Appellants' argument that the speed in which a verdict was reached (two hours and fifteen minutes) indicates the inability of the jury to compartmentalize the evidence is without merit. A reading of the record discloses overwhelming evidence of the guilt of each of the defendants. Therefore, the deliberation time of the jury does not indicate an inability to compartmentalize but, rather, reflects the compact and persuasive evidence of guilt presented by the prosecution.

■ Additionally, appellants argue that severance was required after the prosecution cross-examined defendant Reeves and defendant LaMons about a post-conspiracy cover-up attempt because such evidence spilled over to and colored the case against all defendants. A related argument advanced by appellants is that severance and mistrial motions should have been granted after defendant LaMons' attorney cross-examined Beal about the post-conspiracy cov-

er-up attempt. Such examination is claimed to have prejudiced defendant Reeves' and defendant Shaw's right to a fair trial. The joint brief of appellants recognizes that appellant LaMons cannot claim prejudice by her own introduction of testimony concerning her own acts and statements.

The post-conspiracy cover-up attempt concerns the execution by the loan applicants of property management agreements (PMA) giving Minoco the power to act as the applicant's agent and manage the property forming the basis of the loan. These were back-dated and were prepared by the defendants to explain the loan defaults and lack of improvements to the properties.[4]

A PMA was first mentioned by Perry in responding to a general question by the prosecutor as to when he was next contacted by any of the defendants. Perry did not refer to it as a management agreement and was describing a phone conversation between himself and LaMons when the prosecutor stopped the discussion and requested that the attorneys approach the bench. The prosecutor explained what the PMA was to the judge and indicated that since it fell outside the indictment period the prosecutor was not going to pursue it. The defense attorneys made no comment and the questioning of Perry was continued along different lines. Later, on redirect, Perry testified that he did not have a management agreement with Minoco before he applied for and received the loan proceeds and that it was not until he returned the proceeds over to Reeves and Shaw that they approached him with a management agreement. No defendants objected to this testimony and no motions were made by the defendants as a result of Perry's above-described testimony.

The next reference to a PMA occurred when counsel for defendant LaMons cross-examined Beal directly about signing a PMA. Beal's testimony disclosed that the

---

**4.** The prosecutor here properly declined to use evidence concerning the PMAs in his case in chief; however, we note that acts of concealment done in furtherance of the main criminal conspiracy are ordinarily admissible. *See United States v. Singer*, 660 F.2d 1295, 1306 (8th Cir. 1981).

PMA made Minoco the managing agent for the property and that it was backdated. The only defendant Beal refers to in connection with the PMA is Reeves. During LaMons' attorney's questioning none of the other defendants objected and it was not until some time later when the entire cross-examination by LaMons' attorney was concluded that the other defendants moved for severance on the basis of Beal's testimony concerning the PMA. The court overruled the defense motions and immediately instructed the jury to disregard the testimony relating to the PMA, emphasizing that the PMA was not a part of the case against any of the defendants.

The next mention of a PMA occurred several witnesses and one day later when defendant Reeves took the stand. Reeves independently mentioned a PMA in explaining how the loan responsibilities of a Minoco subsidiary differed from those of Minoco. Later the prosecution cross-examined Reeves specifically about the PMA with Beal. However, *before* that testimony was introduced, the court instructed the jury that evidence regarding the PMA bore only on Reeves' credibility and did not relate to any other defendant. The subsequent testimony by Reeves concerning the PMA with Beal did not refer in any way to any of the other defendants.

The next day, and again after several intervening witnesses, the prosecution cross-examined LaMons about her involvement with the PMA regarding the Perry loan. *Before* this examination, the court carefully instructed the jury that testimony concerning a PMA was only relevant to the witness testifying.

■ The fact that evidence is admissible only as to one defendant and not as to other defendants does not alone require separate trials for the individual defendants. *United States v. Knife*, 592 F.2d 472, 480 (8th Cir. 1979). By portraying themselves as innocent of any wrongdoing, Reeves and LaMons invited cross-examination concerning the PMAs. The jury had to decide whether or not to believe the defendants' respective versions of the events and the PMAs were relevant to the credibility of Reeves and LaMons. *See United States v. McClintic*, 570 F.2d 685, 691 (8th Cir. 1978). The jury was cautioned before Reeves and LaMons testified that evidence regarding any PMA was only applicable to the witness testifying and the judge further cautioned the jury in that regard in his final instructions. These instructions were sufficiently strong to preclude the jury from using the testimony of either Reeves or LaMons about a PMA to convict any other defendant. Likewise, the court's instructions to disregard Beal's testimony concerning the PMA were sufficient to obviate any danger. The admonition was given directly after Beal's testimony and the court again admonished the jury not to consider such evidence in its closing instructions.

The court's numerous instructions protected the defendants from any improper overflow of evidence from one defendant to another. The final instructions emphasized that the jury should consider the case against each defendant separately. Nothing in the record indicates that the jury was confused or failed to follow the court's instructions. The evidence regarding the PMA is not of such a nature that the jury could not compartmentalize it to the particular defendant's credibility to which it was applicable and disregard it otherwise. The defendants have not demonstrated the strong showing of prejudice necessary to support their contentions. The trial court did not abuse its discretion in denying the defendants' motions for severance and mistrial.

### B. *Sufficiency of the Evidence*

■ Appellants argue that the government failed to show that they communicated the false information to the bank and that the indictment for the charges under 18 U.S.C. § 1014 did not fully allege that each defendant communicated false information to the bank. This faulty indictment argument is without merit since a portion of the indictment language (emphasis added) on Counts II, III, IV and V charging violations of 18 U.S.C. § 1014 is as follows:

\* \* \* knowingly and wilfully did make and cause to be made a material false statement in a [loan application] *submitted* in the name of [recruited applicant] *to* the First National Bank of Kansas City \* \* \*.

The indictment sufficiently alleges the necessary elements of a crime under 18 U.S.C. § 1014. Additionally, the testimony of Beal, Perry, McCauley, Miller and the bank officer proves that the defendants communicated the false information to the bank.

The appellants' second argument is that their motions for acquittal should have been granted because there was insufficient evidence to support the convictions. They contend the government did not prove beyond a reasonable doubt the overt acts specified in the indictment and similarly did not prove a mutual understanding to accomplish any goal.

We view the evidence in the light most favorable to the verdict and accept as established all reasonable inferences supporting the conviction. *United States v. Losing, supra,* 560 F.2d at 912. The essence of a conspiracy is an agreement between two or more persons to commit an illegal act. However, this agreement does not have to be expressed or formal and it may be proven by circumstantial evidence. *United States v. Jackson, supra,* 549 F.2d at 530. The conspiracy, therefore, may be inferred from the actions of the parties. *United States v. Boone,* 641 F.2d 609, 611 (8th Cir. 1981).

The evidence overwhelmingly established the existence of a conspiracy to make false representations in loan applications to an FDIC bank. The testimony concerning the four loan applications establishes a conspiracy and establishes the overt acts charged. That testimony is detailed in section I of this opinion and will not be repeated here. Beal, who was a business associate as well as a recruited applicant, testified regarding the activities of all of the defendants. His testimony reveals that all of the defendants knew of or assisted in preparing his false loan application as well as the other loan applications.

"Once the existence of a conspiracy has been established, even slight evidence connecting a particular defendant to the conspiracy may constitute proof of the defendant's involvement in the scheme \* \*." *United States v. Losing, supra,* 560 F.2d at 912. The government is not required to prove that each defendant knew all of the details of the conspiracy. It is sufficient if the government shows that the defendant knowingly contributed efforts in furtherance of the conspiracy. *United States v. Anthony,* 565 F.2d 533, 539 (8th Cir. 1977), *cert. denied,* 434 U.S. 1079, 98 S.Ct. 1274, 55 L.Ed.2d 787 (1978).

A review of the record reveals that the government proved beyond a reasonable doubt the charges in Counts II through V. Each loan applicant testified that one of the defendants recruited him or her to complete and sign a fraudulent home improvement loan application. Recruited applicants testified that the application was false in representing that the applicant owned the property and that the loan proceeds would be used to improve the property. Further, each applicant testified that the loan money was split between themselves and the defendants. The parties stipulated that the bank was insured by the Federal Deposit Insurance Corporation. Bank personnel testified that the bank relied on the applications in approving the loans and issuing the checks. The evidence clearly established that the defendants knowingly made false statements on loan applications for the purpose of influencing the First National Bank of Kansas City.

### C.   *Continuance Motions*

Appellants were indicted on March 9, 1981. The initial trial date was April 27, 1981. However, Reeves requested a continuance and his request was granted. The case was thereafter scheduled to be tried on Monday, June 1, 1981. Reeves had a court-appointed attorney and on the Thursday before the trial was scheduled to begin, May 28, 1981, he met with a private attorney and requested the attorney represent

him. The private attorney contacted the court and a hearing was held on the next day, May 29, 1981, which was the last business day before the trial was scheduled to start. Reeves orally requested a continuance because Reeves' newly-proposed counsel was previously scheduled to appear in another trial. Also on Friday, May 29, 1981, LaMons filed a written motion requesting a continuance due to the complexity of the case and the need for additional time in which to prepare for trial. The court denied both continuance motions and the trial started, as scheduled, on June 1, 1981.

Reeves argues that the court's denial abrogated his freedom to have counsel of his own choosing, that he was denied his Sixth Amendment right and was not given a fair trial. LaMons argues that her request for continuance should have been granted because the numerous documents involved in the case prevented the defense counsel from completing all discovery and witness investigation prior to trial.

■ The trial court has broad discretion in determining whether to grant a continuance. *United States v. Lankford*, 573 F.2d 1051, 1054 (8th Cir. 1978). We are satisfied the court's denial of the two motions for continuance was not an abuse of discretion. Reeves does not have an unlimited right to choose his own attorney and if the attempted exercise of his choice is dilatory, the trial court can require him to proceed with designated counsel. *See United States v. Shuey*, 541 F.2d 845 (9th Cir. 1976), *cert. denied*, 429 U.S. 1092, 97 S.Ct. 1103, 51 L.Ed.2d 537 (1977). Reeves and LaMons waited until the last business day before trial to urge their motions and one previous continuance motion had previously been granted. *Cf. United States v. Dilworth*, 524 F.2d 470, 473 (5th Cir. 1975) (lack of specific motion, delay in contacting court and proposed counsel not prepared to go to trial suggests pretext for delay). The complaining defendants were represented from the time of arraignment by competent, court-appointed counsel who had complete access to the government's files. The district court was in a good position to weigh the need for a change in counsel and the inconvenience to the litigants, the witnesses, other counsel and the court arising from the belated request for a continuance. The court's denial of the motions was not an abuse of discretion.

We are satisfied that the defendants received a fair trial, that the evidence of guilt as to each defendant was overwhelming and that their convictions should be affirmed.

Affirmed.