UNITED STATES of America, Appellee,

v.

**Donald Preston ROSSBACH, Jr., Appellant.**

**No. 81–2150.**

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 13, 1982.

Decided March 4, 1983.

---

Lynnel L. Jones, Minneapolis, Minn., for appellant.

James M. Rosenbaum, U.S. Atty., Janice M. Symchych, Asst. U.S. Atty., D. Minn., Minneapolis, Minn., for appellee.

Before LAY, Chief Judge, and BRIGHT and JOHN R. GIBSON, Circuit Judges.

LAY, Chief Judge.

A federal court jury found Donald Preston Rossbach, Jr., guilty of two counts of rape in violation of 18 U.S.C. §§ 2031 and 1153 and one count of assault in violation of 18 U.S.C. §§ 113(f) and 1153. He was sentenced to concurrent terms of imprisonment of thirty years on each rape count and ten years on the assault count. He appeals.

Rossbach urges the trial court committed reversible error on seven grounds: (1) refusal to dismiss the indictment for grand jury abuse; (2) inadequate voir dire; (3) denial of defendant's motion to disqualify the prosecutor; (4) allowing a public defender to represent defendant when another defender from the same office had been involved in defendant's prior prosecution; (5) permitting leading questions in direct examination; (6) failure to sever the assault count from the rape counts; and (7) admission of evidence of defendant's flight. We find no prejudicial error. We affirm the judgment of conviction.

*Facts.*

On February 27, 1981, Lianne Lussier and Janet Sumner, ages seventeen and fifteen respectively, spent the evening drinking beer and whiskey with friends at a house party on the Red Lake Indian Reservation west of Bemidji, Minnesota. Around 1:00 a.m. Rossbach and Arlan Desjarlait, who had earlier purchased a case of beer, picked up Janet and Lianne, and all four set out to drink beer in Rossbach's pickup truck.

The four went to another party where they continued to drink beer and smoke marijuana for approximately one hour. They left the party and drove Desjarlait home. After dropping off Desjarlait, Rossbach proceeded on Highway 89 toward Bemidji. He pulled off the main road onto an old right-of-way before reaching the Reservation border. He parked the truck in a wooded area, climbed over Lianne and positioned himself between her and Janet.

Rossbach began to strike Janet about the face and forced her out the passenger door. He ordered her to undress; she refused and the struggle continued. Lianne saw a knife in Rossbach's hand, and Janet testified she felt a stabbing pain in her abdomen and discovered blood oozing from the wound. Janet pulled a knife from her jacket pocket and stabbed Rossbach with it. She then felt a stab in her left side. Rossbach stated that he liked the sight of blood and was accomplished at "carving." Janet then threw her knife to Lianne.

Rossbach approached Lianne and took the knife from her. Holding both knives, Rossbach ordered Lianne to undress, face the pickup and bend over, which she did. Rossbach engaged in sexual intercourse with Lianne. Rossbach then ordered Janet to undress and bend over, and he had sexual intercourse with her in a similar fashion. Lianne then told Rossbach to take them home; instead he drove them to another wooded area, stopped the truck and told them to get out, stating that he wanted to "do it again." Janet looked ill and drowsy and stayed in the truck. Lianne got out and submitted once again to Rossbach's demands.

Rossbach let the women go near the Sumner residence at about 5:30 a.m. They told Donna Sumner, Janet's mother, that Rossbach had stabbed Janet. Donna Sumner took Janet and Lianne to the Red Lake Hospital, where Donna Sumner reported the stabbing and the Red Lake police were called. Officer Dwight Bellanger arrived at the hospital at about 6:00 a.m. and en-

countered Lianne crying in a hallway. She then first revealed that Rossbach had raped her and Janet.

Officer Bellanger and another officer went to the scene of the assault, took pictures, and collected physical evidence. They observed a single set of tire tracks, collected three Miller beer cans, found a leather knife sheath bearing the inscription "Mr. Big," [1] and collected samples of apparent body fluids including blood and semen. At approximately 7:00 a.m., Special Agent Joseph Ryan of the FBI was informed of the incident. He conducted a preliminary investigation, interviewed Lianne, and conducted further investigation at both sites. Lianne underwent a sexual assault examination at about 11:00 a.m.

Earlier that morning, shortly before 9:00 a.m., Rossbach's father observed his son sleeping at the family home, where Rossbach had resided since the fall of 1980. Rossbach left home about 9:00 a.m. without telling anyone where he was going. He and his cousin left Red Lake that same day or shortly thereafter in Rossbach's truck and went to San Diego, California. His family did not learn of his whereabouts until sometime after his arrest in San Diego on April 23, 1981.

### A. *The Indictment.*

■ Rossbach first contends that the indictment should have been dismissed because the government deliberately presented only the hearsay testimony of an FBI agent to the grand jury when the complaining witnesses could have been called. This practice prevented the grand jury from viewing the two alleged victims and their alleged inability to express themselves concerning the events of February 27 and 28. The grand jury instead heard only the coherent narrative of the FBI agent. We find this contention without merit. It has long been recognized there is no constitutional preclusion of the use of hearsay testimony in grand jury proceedings. *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406,

100 L.Ed. 397 (1956); *United States v. Gaskill,* 491 F.2d 981, 985 (8th Cir.1974); *United States v. Powers,* 482 F.2d 941, 943 (8th Cir.1973), *cert. denied,* 415 U.S. 923, 94 S.Ct. 1426, 38 L.Ed.2d 479 (1974).

Nevertheless, Rossbach urges us to adopt the rule of *United States v. Estepa,* 471 F.2d 1132, 1136–37 (2d Cir.1972). In *Estepa* a conviction was reversed where the hearsay testimony of a police officer made it appear to the grand jury that he was an actual eyewitness. Because the grand jury was misled, the indictment was dismissed. As we noted in *Powers,* 482 F.2d at 943, whatever the merits of the *Estepa* rule it is not applicable here. Upon review of Agent Ryan's testimony before the grand jury, we find no deceit in his summarization of the case. He never purported to be an eyewitness to the events. He made it clear at the outset that his testimony was based on information he gathered from his investigation. The fact that his testimony was based on hearsay was readily apparent; he identified all the sources of his information. There is no claim and no evidence in the record to suggest that the grand jury was misled into believing that the agent had first-hand knowledge of all that he related. On this basis, we find no merit to the attack on the indictment.

### B. *Voir dire.*

Rossbach claims that the trial court abused its discretion in failing to conduct an adequate voir dire. Rossbach submitted 68 proposed voir dire questions covering racial prejudice, personal backgrounds, prior jury service, the criminal justice system in general, and matters of law, including the burden of proof and the presumption of innocence. The trial court denied Rossbach's motion to allow his attorney to conduct the voir dire and conducted the entire voir dire from the bench.

■ This court has long recognized that "[a] searching voir dire is a necessary incident to the right to an impartial jury.

---

1. "Mr. Big" is Rossbach's nickname. He is known by that name throughout the Red Lake Reservation and he has a tattoo on his arm that says "Mr. Big."

However, it is fundamental that the trial court has broad discretion in deciding what questions to ask and that its rulings will not be reversed absent an abuse of discretion." *United States v. Bear Runner,* 502 F.2d 908, 911 (8th Cir.1974) (citations and footnote omitted). Under our decisions the trial court acted within the scope of its discretion in questioning the jurors and giving them preliminary instructions. *See United States v. Hall,* 588 F.2d 613, 615 (8th Cir. 1978); *United States v. Brown,* 540 F.2d 364, 378–79 (8th Cir.1976); Fed.R.Crim.P. 24(a).[2] We find neither an abuse of discretion nor that Rossbach was prejudiced from the manner in which the court conducted voir dire.

## C. *Disqualification of counsel.*

■ Rossbach next contends the trial court erred in denying his motion to disqualify the assistant United States Attorney who prosecuted his case. He complains that the prosecutor gained an unfair advantage by trying the government's case after she had participated in his guilty plea hearing and plea withdrawal hearing. On the day set for trial, July 13, 1981, Rossbach had informed the court that he wanted to enter a plea of guilty to one count of rape. The court conditionally accepted the plea pursuant to rule 11 of the Federal Rules of Criminal Procedure. The next day, Rossbach wrote a letter to the judge in which he stated that his attorney had been unprepared for trial, and that he wished to withdraw the guilty plea and go to trial. The court treated the letter as a motion to withdraw the guilty plea pursuant to rule 32(d) of the Federal Rules of Criminal Procedure.

On August 17, the court appointed Scott Tilsen to be Rossbach's new attorney. Tilsen advised Rossbach that he would have to waive the attorney-client privilege with respect to his prior counsel if he wanted to withdraw his guilty plea. Rossbach agreed and proceeded with the plea withdrawal motion. At the same hearing the assistant United States Attorney agreed not to review the defense file to prepare for the withdrawal hearing, and also agreed not to meet with Rossbach's prior attorney unless Tilsen was present to protect against an overly broad waiver of the attorney-client privilege.

The plea withdrawal hearing was held on August 20 and 21, and the motion to withdraw the guilty plea was granted. Rossbach moved to disqualify the assistant United States Attorney from further participation in the case, and the court denied the motion. Rossbach renewed his motion for disqualification at trial after the government presented its case in chief. The motion was again denied.

Rossbach would have this court hold that continuous vertical representation requires a per se disqualification of the prosecuting attorney for trial, without any demonstration of prejudice. Rossbach analogizes to cases in which the government used immunized testimony or improperly monitored attorney-client communications. *See, e.g., Kastigar v. United States,* 406 U.S. 441, 460, 92 S.Ct. 1653, 1664, 32 L.Ed.2d 212 (1972); *United States v. McDaniel,* 482 F.2d 305, 310–11 (8th Cir.1973). Neither situation presents itself here. At no point during the rule 32 plea withdrawal hearing did Rossbach object to the government's questioning on the grounds it exceeded the scope of the attorney-client privilege waiver. At no point during the government's presentation of its case or cross-examination did Rossbach object on the ground the evidence sought was derived from pretrial hearings. The government was fully prepared for trial before Rossbach's rule 11 and rule 32 proceedings ever commenced. Prior to trial the government provided the trial court

**2.** As author of this opinion, and I speak only for myself, I express a belief that every trial lawyer should be allowed to conduct a personal voir dire of every juror. I find that most trial judges allow the lawyer at least to share the voir dire with the trial judge. The concern that this can result in argumentative or time-con-

suming tactics is superficial. Voir dire can be judicially supervised as well as any other phase of the trial. Lawyers are much more conversant with their case than the trial judge. To enable a fair trial, it is my experience that every trial counsel should be allowed to test latent prejudices on a one-to-one basis.

with an offer of proof describing its independent sources of various items of proof. There clearly was an independent basis for prosecution. Rossbach has shown no prejudice as a result of the prosecutor's continual representation and we see no error in the trial court's denial of his motion.

### D. Counsel's conflict of interest.

 Next, Rossbach urges that the trial court erred in allowing a federal public defender, Scott Tilsen, to represent him, because another attorney in the public defender's office had been involved in a prior successful prosecution in state court. Daniel Scott, a federal defender for the district of Minnesota at the time of trial, had earlier, as an assistant United States Attorney, assisted in an investigation leading to a prosecution of Rossbach in state court. It is fundamental that a criminal defendant is entitled to the assistance of an attorney unfettered by a conflict of interest. *See United States v. Agosto,* 675 F.2d 965, 969 (8th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 77, 74 L.Ed.2d 74 (1982) (joint representation conflict). However, we find no actual conflict here.

Rossbach fails to articulate any actual conflict or set forth any factual basis for ineffective representation during trial. Scott did not actually prosecute Rossbach in the earlier case; Tilsen never discussed the earlier case with Scott. Nothing in the record suggests that Tilsen did not effectively advocate Rossbach's position throughout the proceedings. Further, after inquiry by the court, Rossbach stated he had no objection to Tilsen's representation and Tilsen stated that he did not perceive any conflict in his representation. *See Holloway v. Arkansas,* 435 U.S. 475, 485–86, 98 S.Ct. 1173, 1179, 55 L.Ed.2d 426 (1978). We find no actual conflict on the basis of this record and no error in the trial court's appointment of counsel.

### E. Leading questions.

 Rossbach next contends that the trial court abused its discretion by permitting the prosecutor to use leading questions in her examination of the two victims. Rossbach urges that neither the ages, fifteen and seventeen, nor the emotional condition of the witnesses necessitated the use of leading questions. Rule 611(c) of the Federal Rules of Evidence states that leading questions should not be used on the direct examination of a witness except as may be necessary to develop his or her testimony.

This court has approved the use of leading questions in cases quite similar to this one. *United States v. Littlewind,* 551 F.2d 244, 245 (8th Cir.1977) (prosecution for rape on victims thirteen and fourteen years of age); *cf. United States v. Iron Shell,* 633 F.2d 77, 92 (8th Cir.1980), *cert. denied,* 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981) (defendant convicted of assault with intent to commit rape; leading questions allowed during examination of nine-year-old victim). Both the witnesses in this trial were hesitant to answer questions regarding the sexual assaults. Both testified that Rossbach threatened to kill them if they told anyone what had occurred. We have reviewed the transcript of the witnesses' testimony and are satisfied that the prosecution's use of leading questions was necessary and was not excessive. The district court acted well within its discretion in allowing the examinations.

### F. Severance.

 As his sixth assignment of error, Rossbach contends that the trial court abused its discretion in failing to sever count I, the assault charge, from counts II and III, the rape charges. Rossbach wanted to testify to the assault charge and remain silent on the charges of rape. Severance was denied and Rossbach did not testify in his own defense.

Rule 8(a) of the Federal Rules of Criminal Procedure permits joinder of offenses that are based on the same act and rule 14 permits severance to avoid undue prejudice. Offenses that are similar in character and occurred over a short period of time are ordinarily joined. *See United States v. McClintic,* 570 F.2d 685, 689 (8th Cir.1978); *United States v. Riley,* 530 F.2d 767, 770

(8th Cir.1976). Even if the counts had been severed, evidence of each crime would have been admissible in the trial of the other under Federal Rule of Evidence 404(b) on the issue of criminal intent. The evidence would be necessary "to complete the story of the crime." *United States v. Two Eagle,* 633 F.2d 93, 95 n. 3 (8th Cir.1980). Admitting evidence of the other offense would have placed Rossbach in virtually the same position as joinder of the offenses, and thus we find no showing of prejudice or abuse of discretion here. *See McClintic,* 570 F.2d at 689 (reversal only on a showing of clear prejudice and abuse of discretion).

### G. *Flight.*

■ Rossbach's last assertion is that the trial court should not have admitted evidence of flight following the crimes or instructed the jury on the issue of flight. In his offer of proof Rossbach alleged that his departure after the incident was due to prior difficulties with a brother of one of the victims and his previous plans to travel to California. He further stated that at no time during his absence did he attempt to conceal his whereabouts. He contends flight evidence should have been excluded as irrelevant or prejudicial.

This court analyzed the probative value of flight evidence in *United States v. Peltier,* 585 F.2d 314, 323 (8th Cir.1978), *cert. denied,* 440 U.S. 945, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979). There we held that the probative value of flight as circumstantial evidence of guilt depended upon the strength and validity of drawing four inferences. We find here there are sufficient evidentiary manifestations to render the flight evidence probative of consciousness of guilt and of guilt itself. First, Rossbach left the reservation within hours of the incident. Prior to his departure, he had resided with his family continuously for several months. Second, he did not tell his immediate family where he was going;

they did not learn of his whereabouts until after his arrest in California. Third, consciousness of guilt is manifested by his threat to kill the victims if they reported the incident. Last, there was evidence at the site of the initial assaults that Rossbach returned to the scene after the authorities had commenced their investigation and gathered evidence there.[3] Under these circumstances we find that the evidence of flight was highly probative. We hold that the evidence of flight was properly admitted.

The judgment of the district court is affirmed.

---

**3.** When Red Lake police officers examined the scene of the first assault at 7:00 a.m., there was one set of tire tracks other than those of police vehicles. When FBI Agent Ryan returned to the site at 10:30 a.m., there was a second set of tracks identical to both the first set and the tracks at the scene of the second assault. This new set of tracks led away from the reservation toward Bemidji.