UNITED STATES, Appellee,

v.

Charles LONG SOLDIER, Appellant.

No. 77–1137.

United States Court of Appeals,
Eighth Circuit.

Submitted June 14, 1977.

Decided Oct. 5, 1977.

Bruce Ellison, Wounded Knee Legal Defense/Offense Committee, Rapid City, S. D., on brief for appellant.

James S. Hill, Asst. U. S. Atty., Bismarck, N. D., for appellee; James R. Britton, U. S. Atty., on brief.

Before LAY and ROSS, Circuit Judges, and MILLER, Judge.*

LAY, Circuit Judge.

Charles Long Soldier was convicted on Count I of a three count indictment following a jury trial in the United States District Court for the District of North Dakota. Count I charged that the defendant used a deadly weapon to assault Victor Provost, a Bureau of Indian Affairs employee, in violation of 18 U.S.C. § 111 and § 1114. Counts II and III charged that the defendant assaulted Duane Yellow Hawk and William Jumping Eagle, respectively, with a dangerous weapon in violation of 18 U.S.C. § 1153 and South Dakota Compiled Laws § 22–18–11. The jury returned a verdict of guilty on Count I and not guilty on Counts II and III. The defendant has appealed his conviction, asserting that (1) the prosecution improperly used out of court statements of a government witness; (2) an illegal search led to discovery of the weapon in question; (3) the admission of exculpatory statements made by the defendant prior to the time he was given proper constitutional warnings constituted error; (4) the trial court wrongfully refused to allow further interrogation of prospective jurors on voir dire; and (5) the trial court erred in instructing the jury upon all elements of the offense in question. We affirm the conviction.

On February 8, 1976, at around 4:30 A.M. near Manderson, South Dakota, on the Pine Ridge Indian Reservation, a number of shots were fired at a Bureau of Indian Affairs patrol car in which Officer Victor Provost was seated. Two of the bullets struck the right rear panel of the vehicle. At the time of the incident, Provost was talking to two off-duty officers, Duane Yellow Hawk and William Jumping Eagle, in a private vehicle parked alongside the patrol car. None of the individuals was injured. All of them agreed that the shots appeared to have been rifle shots.

About two hours after the shooting, Agents Price and Wood of the Federal Bureau of Investigation arrived at the scene and began their investigation. The officers determined that the shots came from the northwest, and approximately 100 yards northwest of the vehicle two empty .30-caliber expended shell casings were discovered. The agents also noticed a number of footprints and car tracks near the area, most of which led in a northerly direction toward the Manderson housing.

As the officers began to conduct a general inspection of the Manderson housing area, Agent Price was informed of the discovery of three one-dollar bills near house number 129. A decision was made to interview the occupants of house 129, Henry and Agnes Black Elk. After approaching the house and identifying themselves, the officers were admitted by Henry Black Elk. They informed the Black Elks that they were looking for a man with a rifle. Henry

* The Honorable Jack R. Miller, Judge, United States Court of Customs and Patent Appeals, sitting by designation.

Black Elk told Agent Price that the defendant was in the back of the house. The two FBI agents then went toward the back of the house where they encountered Charles Long Soldier. Long Soldier, accompanied by Agent Wood, went into the living room and Agent Price asked Agnes Black Elk where the defendant hid the rifle. She pointed to a mattress in the back bedroom, and under the mattress Agent Price found a .30-caliber rifle. Price went to the living room and asked the defendant if he had ever seen the rifle and if he owned a rifle. The defendant answered no to both questions. He was then arrested, advised of his rights, and taken to the tribal jail in Pine Ridge. Agents Price and Wood remained at the Black Elk residence to interview members of the Black Elk family. Statements allegedly given to Agent Price by Henry Black Elk at this time and repeated in Black Elk's testimony before the grand jury are the basis of the defendant's first contention on appeal, that the trial judge erred in allowing improper impeachment of Black Elk as to these statements.

■ We consider the two most meritorious contentions on appeal to be: (1) whether out of court statements allegedly made by the government witness Black Elk were properly admitted; and (2) whether the trial court erred in his instructions regarding the elements of the offense charged.[1]

*Out of Court Statements of Black Elk.*

Henry Black Elk was called as a witness by the government. He testified as to the events which took place at his home in the early morning hours of February 8, 1976. He recalled with specific clarity that the defendant, whom he did not know at the time, had come to his home at 5:30 A.M. accompanied by Pat White Hawk, a man Black Elk knew. The defendant asked to come in and warm up. Black Elk stated that the defendant had a 30-30 rifle with him and was intoxicated. A short time later Black Elk observed police officers approaching his house. He testified that when they knocked on the door Long Soldier went into a back room with the rifle. Black Elk acknowledged that before the police officers came to the door he and the defendant had a conversation. On direct examination he stated that they talked about Indian history and "stuff" and drank wine. When asked whether Long Soldier had stated "where he had been prior to coming to your house," Black Elk said: "He never mentioned anything; but I did talk with him on that Indian history and stuff." Later in his testimony Black Elk was again asked about this conversation and government counsel said: "[Y]ou talked about some pow wows . . . did you have

1. We elect to give plenary discussion to only two of the issues raised since we feel the record undeniably requires us to reject the other grounds raised:

 (1) The trial court denied defendant's motion to suppress the rifle allegedly used in the assault on the basis of Long Soldier's lack of standing to challenge the search and seizure made in Black Elk's home. We assume defendant's standing arguendo but find the search was proper on the basis of the proven consent of third parties, Mr. and Mrs. Black Elk, whose home was searched. *Cf. United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Maxwell v. Stephens,* 348 F.2d 325, 336 (8th Cir. 1965).

 (2) Defendant's statements concerning the rifle made at the time he was confronted by the investigating officers were admissible under the rationale of *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), where the Supreme Court held that, absent a custodial arrest, interrogation of a suspect does not require *Miranda* warnings. Defendant relies

on *Orozco v. Texas,* 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969), where the Court held inadmissible statements elicited when the defendant was questioned in his bedroom by arresting officers. However, in *Orozco,* a police officer testified that from the moment the defendant gave the officers his name he was under arrest. In the present case, although the defendant was under suspicion, the officers testified that when he was initially questioned his freedom had not been restrained and no intent had been formed to place him under arrest.

 (3) The record indicates that the trial judge did not abuse his discretion in refusing to allow defendant's counsel to make further inquiry of the prospective jurors concerning racial bias. *See United States v. Crow Dog,* 532 F.2d 1182, 1198 (8th Cir. 1976), *cert. denied,* 430 U.S. 929, 97 S.Ct. 1547, 51 L.Ed.2d 772 (1977). The record is replete with specific questioning by the court concerning possible prejudice. Under the circumstances we find no abuse of the trial court's discretion in this regard.

any other conversation at that time with Long Soldier?" Black Elk responded: "No, we didn't." Thereafter government's counsel asked Black Elk:

Q. All right, Mr. Black Elk, did you tell Mr. Price the following—or in essence the following: That you sat at the table with Long Soldier—

MR. ARCHULETA: Your Honor—

MR. BULLIS:—and that Long Soldier said in Lakota "I used this gun to shoot into them pigs five times"? Did you make that statement?

THE WITNESS: That I don't remember; but that agent sitting there promised distinctly that he will not take me to court, and I could prove it; but now he's got me in here.

. . . . .

Q. Did you make that statement to Mr. Price at that time? Did you tell Mr. Price that that's what Mr. Long Soldier had told you?

A. If I did tell him, I don't remember.

Q. All right. Let me ask you: Did you state this to the FBI? Did you tell the FBI agent that Long Soldier showed you a shell from the gun which was a .30-caliber shell? Long Soldier boasted "We're AIMs. Nobody can get us. I'm waiting for the goons."

Did you tell that to Mr. Price?

A. That I don't remember.

Thereafter the following questions were asked:

Q. (Mr. Bullis continuing) Mr. Black Elk, I'm also going to ask you: Do you recall testifying before a Federal grand jury on March 18th, 1976?

A. Yes.

Q. Your answer was "Yes"?

A. Yes.

Q. Do you remember your testimony at that time?

A. Yes.

. . . . .

Q. All right. Will you tell us what your testimony was at that grand jury proceedings?

A. My testimony was that Mr. Long Soldier came in my house with a gun and they apprehended him, and I told the grand jury—I said "I'm scared—I'm scared of the AIMs and for my family. Under the Fifth Amendment I cannot testify any more," I said, "because my family will be under what I mean harassment."

Q. All right. Was there anything else that you testified to at that grand jury proceedings?

A. That I don't remember.

Q. You don't remember?

A. Huh-uh. That's been a long time ago.

. . . . .

Q. Well, Mr. Black Elk, I'm going to ask you whether or not the following question was asked of you and whether you gave the following answer:

Question: "Let me just go back to the time you talked with this man you didn't know and ask you in a conversation if he didn't say to you, 'I used this gun to shoot into them pigs five times?'"

Answer: "At the time he was intoxicated, which he did say."

Did you give—was that question asked and that answer given?

A. That was asked and that's the way I answered. I was intoxicated.

Q. Are you saying, Mr. Black Elk, that you were intoxicated at the time you testified before the grand jury?

A. No. At the time they asked me questions.

Q. Well, I'm asking you if you gave this answer before the grand jury?

A. Yes, I did.

Prior to the examination before the jury the defense had moved to suppress Black Elk's statements to Price and the grand jury on the ground that Black Elk's testimony was not inconsistent with his prior statements. The trial court ruled that Agent Price could not take the stand to rebut Black Elk, relying upon *United States v. Allsup,* 485 F.2d 287 (8th Cir. 1973). The

court ruled, however, that Black Elk could be interrogated concerning his recollection of what Long Soldier had told him and that the grand jury testimony would be admissible.

Rule 801(d)(1)(A) of the Federal Rules of Evidence provides:

(d) Statements which are not hearsay. A statement is not hearsay if—

(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition . . .

 It is well established that testimony before a grand jury constitutes "other proceedings" within the rule.[2] The question we face is whether proper foundation for the use of the grand jury statement was established by testimony inconsistent with it and harmful to the government's case. The record shows that Black Elk affirmatively denied that Long Soldier had made any statement to him concerning the events in question. We find Black Elk's denial that Long Soldier had admitted culpability inconsistent with his prior statements.[3] *Cf. United States v. Rivera,* 513 F.2d 519 (2d Cir.), *cert. denied,* 423 U.S. 948, 96 S.Ct. 367, 46 L.Ed.2d 284 (1975). There exists a substantive difference between a witness' failure to recall an incriminating statement made by the defendant and an affirmative denial that a defendant made an admission of guilt to him. There is more than a subtle distinction here. In the first instance there is nothing harmful in evidence and any attempt to "impeach" becomes subterfuge. The out of court statement then assumes paramount importance as substantive evidence. *See United States v. Dunmore,* 446 F.2d 1214, 1221 (8th Cir. 1971), *cert. denied,* 404 U.S. 1041, 92 S.Ct. 126, 30 L.Ed.2d 734 (1972). However, where a witness affirmatively denies that the defendant made an admission of guilt to him, there is at least an exculpatory inference that something did not take place as alleged and impeachment should be allowed. It should also be noted that Black Elk's testimony as a whole was of vital importance to the government's case. We are not presented with a situation in which the government called this witness solely for the purpose of introducing otherwise inadmissible evidence under the guise of impeachment. *Cf. United States v. Morlang,* 531 F.2d 183, 189 (4th Cir. 1975).[4]

 Under the circumstances, the use of Black Elk's alleged statement to Agent Price was likewise proper impeachment of Black Elk's trial testimony. Furthermore, the statement contained substantially the same information which Black Elk told to the grand jury, and therefore the effect was cumulative and could not be considered

---

**2.** *See United States v. Mosley,* 555 F.2d 191, 193 (8th Cir. 1977). *See also* S.Rep.No. 93–1277, 93d Cong., 2d Sess. (1974); H.Rep.No. 93–650, 93d Cong., 1st Sess. (1973); H.Rep.No. 93–1597, 93d Cong., 2d Sess. (1974) (Conference Committee Report), U.S.Code Cong. & Admin.News 1974, p. 7051.

**3.** The common law rule prior to adoption of the Federal Rules of Evidence required that, before impeaching his own witness by use of prior inconsistent statements, a party show that the testimony at trial surprised the party as well as substantially harmed the party's case. *See United States v. Allsup,* 485 F.2d 287 (8th Cir. 1973). However, in view of Fed.R.Evid. 607, which provides that either party may impeach any witness, surprise is no longer a viable requirement. *See* 4 J. Weinstein & M. Berger, Weinstein's Evidence 801–7 (1976). *See also*

*United States v. Jordano,* 521 F.2d 695, 697 (2d Cir. 1975) and *United States v. Rivera,* 513 F.2d 519 (2d Cir.), *cert. denied,* 423 U.S. 948, 96 S.Ct. 367, 46 L.Ed.2d 284 (1975), where in both cases the court upheld impeachment of a government witness despite the fact that the witness' testimony was identical to that given in a prior trial. We conclude that, since Black Elk's testimony was sufficiently harmful to the government's case, impeachment was proper regardless of whether surprise was established.

**4.** The use of Black Elk's grand jury testimony did not result in a denial of the defendant's right of confrontation. Black Elk admitted making the statement before the grand jury and was available for cross-examination during his testimony at trial. *See California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).

reversible error. *See United States v. Mosley,* 555 F.2d 191, 193 (8th Cir. 1977); *United States v. Davis,* 551 F.2d 233, 235 (8th Cir. 1977).

*Jury Instructions.*

■ The defendant was charged under Count I of the indictment with using a deadly or dangerous weapon to willfully and forcibly assault Victor Provost in violation of 18 U.S.C. § 111.[5] When the trial court instructed the jury he read the indictment in full, but when he read the text of 18 U.S.C. § 111, he included only paragraph one of the statute. He then set out the essential elements of the crime as follows:

There are two essential elements required to be proved in order to establish the offense charged in Count One of the Indictment:

First: the act or acts of forcibly assaulting, resisting, opposing, impeding, intimidating or interfering with an officer of the Indian Field Service of the United States while said officer was engaged in the performance of his official duties; and

Second: the doing of such acts wilfully.

The government concedes that the trial court erred in failing to include the use of a dangerous weapon as an essential element of the crime. However, we find no prejudicial error when the charge to the jury as a whole is considered.[6]

Before instructing the jury as to the essential elements of the crime under § 111 the trial court read the indictment containing each count. Count I was read as follows:

On or about the 8th day of February, 1976, near Manderson, in the District of South Dakota, Charles Long Soldier did use a deadly or dangerous weapon to willfully and unlawfully forcibly assault, resist, oppose, impede, intimidate and interfere with Victor Provost, an employee or officer of the Indian Field Service of the United States, to-wit: Bureau of Indian Affairs, while Victor Provost was engaged in and on account of the performance of his official duties, in violation of 18 U.S.C. Section 111 and Section 1114.

Immediately following the instruction containing the essential elements of Count I (which omitted the language concerning use of a firearm) the court instructed as follows:

The mere fact that the jury may find from the evidence in the case that the accused was in possession of a rifle at the time and place alleged in the Indictment does not constitute an offense against the laws of the United States. If you do not find beyond a reasonable doubt from the evidence in the case that the Defendant did wilfully and unlawfully forcibly assault, resist, oppose, impede, intimidate or interfere with Victor Provost, an employee or officer of the Indian Field Service of the United States, while Victor Provost was engaged in and on account of the performance of his official duties, *all as charged in Count One of the Indictment,* . . . then it is immaterial that the Defendant may have had in his possession a rifle. (Emphasis added).

---

**5.** 18 U.S.C. § 111 reads as follows:

Whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of his official duties, shall be fined not more than $5,000 or imprisoned not more than three years, or both.

Whoever, in the commission of any such acts uses a deadly or dangerous weapon, shall be fined not more than $10,000 or imprisoned no more than ten years, or both.

**6.** The defendant relies on *United States v. Singleton,* 532 F.2d 199 (2d Cir. 1976), as support for his contention. In that case, the Second

Circuit reversed a conviction for possession of stolen mail where the trial court failed to instruct that the fact that the mail was, in fact, stolen was an essential element of the crime. In *Singleton,* however, the court recognized that the instructions taken as a whole were sufficient to instruct the jury that the mail must be stolen to support the charge. The reversal on appeal was based on the fact that the trial court indicated to the jury during instructions that the mail was stolen. The court held that such a "directed verdict" as to one element of the crime was reversible error. *Id.* at 206.

Further instruction to the jury was generally given and can be considered applicable to all three counts. The court said:

So, a person who has the apparent present ability to inflict bodily harm or injury upon another person, by the use of a deadly or dangerous weapon, and wilfully as by intentionally flourishing or pointing a loaded pistol or gun at another person, may be *found guilty of forcibly assaulting* the other person with a deadly or dangerous weapon. (Emphasis added).

There exists an additional factor here. In the present case, the undisputed evidence indicated that the assault against Officer Provost was committed by the use of a rifle. The defendant does not controvert these facts. His defense, which the jury rejected, was that he did not commit the assault which occurred.

In *United States v. Rouse,* 452 F.2d 311 (5th Cir. 1971), the court upheld a conviction under 18 U.S.C. § 111 despite the trial court's failure to include the use of a deadly weapon as an essential element of the crime. The court held that the charge, taken as a whole, had indicated that use of a deadly weapon was necessary in light of the fact that all evidence in the case dealt with an assault by the use of a knife.

Under the circumstances presented here, we consider the omission of an essential element of the charge in the questioned instruction as harmless error.

The judgment of the trial court is affirmed.