**UNITED STATES of America, Appellee,**

v.

**James Ray THOMPSON, Appellant.**

**No. 81–1099.**

United States Court of Appeals,
Eighth Circuit.

Submitted May 21, 1982.

Decided Feb. 10, 1983.

Rehearing and Rehearing En Banc
Denied March 14, 1983.

Heaney, Circuit Judge, filed a dissenting opinion.

Robert C. Evenstad, Sandstone, Minn., Nicholas J. Spaeth, Vogel, Brantner, Kelly, Knutson, Weir & Bye, Ltd., Fargo, N.D., for appellant.

James R. Britton, U.S. Atty., James S. Hill, Sp. Asst. U.S. Atty., Bismarck, N.D., for appellee.

Before HEANEY, ROSS and JOHN R. GIBSON, Circuit Judges.

**1296**

JOHN R. GIBSON, Circuit Judge.

James Ray Thompson was convicted of four counts of aiding and abetting in the transportation of, or causing to be transported, four stolen pieces of farm or construction equipment in violation of 18 U.S.C. §§ 2312 and 2314 and of one count of conspiring to transport stolen goods in interstate commerce in violation of 18 U.S.C. § 2314. He was sentenced to five years imprisonment on each of the five counts, the sentences to run concurrently. He brings this appeal and filed a brief pro se, after representing himself in the trial pro se. We earlier appointed counsel to draft a supplemental brief addressing two issues: (1) Did the district court[1] commit plain error in permitting the government to ask three witnesses whether they had formed an opinion as to whether someone other than Dale Johnson was involved in transporting machines to North Dakota, and (2) Did the district court err in permitting the prosecutor to question three of the witnesses with respect to testimony from earlier trials either to refresh the witness's recollection or to impeach the witness's credibility. Having considered the claims made in Thompson's initial brief, and those made with respect to the two issues on supplemental briefing, we affirm.

The charges in this case arise out of a series of occurrences extending over approximately six months in which a total of six pieces of farm and construction equipment stolen in Indiana were brought to the Minot or Velva, North Dakota area for sale. We have decided cases involving other participants in this chain of events. *See, United States v. Reed,* 658 F.2d 624 (8th Cir. 1981), *cert. denied sub nom. Bibby v. United States,* 455 U.S. 1002, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982); *United States v. Eckmann,* 656 F.2d 308, 314 (8th Cir.1981). *Reed* contains a full statement of the facts surrounding these occurrences. Convictions of Albert J. Bibby and Orin Scott Reed were upheld and the conviction of Wallace

Eckmann was reversed and remanded for new trial. Dale Linn Johnson and Roland Edward Mathis did not appeal their convictions.

Thompson made the first of several trips to Velva, North Dakota some time between late August and mid September, 1979. The visit was unexpected by Dale Johnson, an acquaintance of Thompson. Thompson inquired of Johnson what kind of farm tractors were being used in the area and Johnson replied John Deere, International, and Steiger. They also discussed Case tractors. When Johnson told Thompson that he had a friend interested in buying a payloader, Thompson said he would try to find one.

Thompson left Velva shortly thereafter and on September 15 a John Deere Model 644B payloader was transported to Velva by Albert J. Bibby. Between Thompson's departure and the arrival of the payloader in North Dakota, Johnson had several telephone conversations with Thompson. The two further discussed Johnson's friend's desire for a payloader and Thompson stated that he had found a payloader that supposedly had been wrecked. Johnson was aware that Thompson had a payloader on the way but did not know the details of its transportation.

After the arrival of the payloader, Thompson told Johnson that the price for the machine was $20,000. Johnson was bothered by the absence of a cab and bucket from the payloader and Thompson told him that he would find replacements. The Deere 644B payloader was stolen from Fort Wayne, Indiana on September 5, 1979.

Johnson knew that Roland Mathis wanted a uniloader. Thompson and Johnson made arrangements for Johnson to travel to the Chicago area. While in Chicago Thompson assisted Johnson in the purchase of a truck. On September 26, 1979, they went to a junkyard operated by Orin Scott Reed in Rochester, Indiana. A small Case 1830 uniloader was loaded onto Johnson's truck at the junkyard along with a cab and

---

1. The Honorable Paul Benson, Chief Judge, United States District Court for the District of North Dakota.

bucket for the 644B payloader. When Johnson asked for a bill of sale, Reed became quite upset. Johnson paid Thompson for the uniloader while at the junkyard. The uniloader which Johnson bought on September 26, 1979 had been stolen from Wabash, Indiana three days earlier.

The cab and bucket for the payloader were delivered to North Dakota and placed on the payloader. Danny Schatz, who then had possession of the payloader, could tell from the way paint scratches matched on the bucket and cab and the remainder of the machine that the bucket and cab had originally come from that machine.

Johnson drove the uniloader from the Chicago area to North Dakota. Shortly thereafter, Thompson returned to North Dakota and was present when the uniloader and payloader were delivered to George Vitko and efforts made to sell the machines to Vitko. After Vitko refused to buy the machines, Thompson assisted Mathis in taking the two machines from Vitko's place of business to the warehouse of Morelli's, a beer distributorship of which Mathis was general manager.

Around October 6 Bibby appeared at Velva with two farm tractors, Case models 2090 and 2670. Johnson earlier had seen Thompson and Reed stopped along the highway outside Chicago placing fuel in a Case 2090 tractor. One of the two tractors was stolen from Valparaiso, Indiana on September 29, 1979 and the other was stolen from Wabash, Indiana on September 23, 1979. Thompson assisted in unloading the tractors at the Morelli warehouse.

The Case uniloader was ultimately taken to Mathis's home. The other three machines remained at the warehouse. Mathis made several attempts to sell the machines but had difficulty because there were no ownership documents. The price for the machines was set by Thompson.

On November 26, 1979, a Case 2390 tractor and a Case 450B dozer were stolen in Warsaw, Indiana and shortly thereafter were transported to North Dakota by Bibby. Thompson had called Johnson to discuss delivery of the dozer and tractor.

After the machines arrived, Thompson returned to North Dakota and met with Mathis and Johnson. Thompson gave Mathis several serial number plates for Case equipment to be used for warranty on the two machines.

There was evidence of a number of telephone calls between Dale Johnson in North Dakota and James Thompson in the Chicago area in September, 1979 before delivery of the payloader. Calls frequently were routed to Thompson's pager and within minutes Thompson would return the call. Joyce Baker, who later married Thompson and who worked at Jake's Club in Velva, on several occasions called Bibby or Reed on behalf of Thompson.

Thompson testified on his own behalf. Joyce Baker also testified. Thompson explained contacts with Johnson by stating that the two were negotiating the sale of a truck, the purchase of an interest in Jake's Club where Johnson worked and in which Mathis had an ownership interest, the purchase of an antique Lincoln Zephyr, and the purchase of a silver mine in Colorado.

Thompson was charged with transporting or aiding and abetting the transportation in interstate commerce of the stolen John Deere payloader model 644B in Count I. Count III dealt with the Case model 1830 uniloader, Count IV the Case tractor model 2090, and Count V the Case dozer model 450B.

I.

Thompson claims that the district court committed plain error in allowing the government to elicit opinions from four witnesses that Thompson was involved in the conspiracy. Thompson argues that Fed.R. Evid. 701 was not satisfied. Rule 701 provides:

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are: (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

No objection was made to any of the opinion testimony.

The first opinion was given by Mathis. He testified that he had an opinion that someone other than Dale Johnson was involved in the gathering and bringing of machines to North Dakota and in his opinion this was Thompson. Before giving this opinion, Mathis testified that he had gone to the Vitko yard with Thompson and Johnson to look at the machinery and that Thompson transported the payloader from the Vitko yard to Morelli's warehouse. He said Bibby arrived with two more tractors and transported the uniloader to Mathis's home, and thereafter Mathis and Thompson each unloaded one of the newly arrived tractors from the Bibby trailer. It was with this background that Mathis expressed his opinion that Thompson was involved. As further support for the opinion, Mathis stated that he had seen Thompson with Johnson.

During his interrogation Mathis expressed solid facts within his personal knowledge. This was recognized as a foundation for an opinion in *United States v. Freeman,* 514 F.2d 1184, 1191 (10th Cir. 1975). The opinion was rationally based on Mathis's perception. *See, United States v. McClintic,* 570 F.2d 685, 690 (8th Cir.1978). While we do not have the full discussion between the witness and defendant as in *McClintic,* Mathis's statements that Thompson was present when the payloader and uniloader were moved, that Thompson actually moved one of the machines, that Thompson was present at the arrival of the second load of two tractors, and that Thompson drove one of the tractors off the trailer and stored it in the Morelli warehouse are facts that speak as eloquently as the discussions in *McClintic.*

The opinions expressed by Mathis were "shorthand rendition[s] of [Mathis's] knowledge of the total situation and the collective facts." *United States v. McClintic,* 570 F.2d at 690, *quoting, United States v. Freeman,* 514 F.2d at 1191. The conclusion that Thompson was involved is simply a short description of the entire situation as known to Mathis.

Thompson complains that the government attempted to elicit an opinion from Mathis based upon evidence heard in prior trials involving other defendants. The transcript reveals, however, that Mathis was unable to answer the questions. Mathis simply expressed his opinion held in October, 1979 that Thompson was involved in the conspiracy and theft of the machines. This opinion went directly to the ultimate issue in the case. This, however, did not make the testimony improper. Fed.R.Evid. 704; *United States v. Freeman,* 514 F.2d at 1191; *United States v. McClintic,* 570 F.2d at 689–90. The witness's testimony in *McClintic,* that the defendant knew that merchandise had been fraudulently obtained, is similar to the testimony in this case.

Before Mathis gave this final opinion, he had testified that Thompson had brought him two identification plates to be placed on the machinery for warranty purposes. This bolstered the factual foundation supporting his opinion.

Dale Johnson also expressed an assumption that money from the sale of the tractors would go to Thompson and Scott Reed. Before giving this opinion, Johnson testified that Thompson had quoted him the price of the two tractors and the payloader and that he had personally paid Thompson $4500 for the uniloader. Johnson also testified that he had gone with Thompson to Rochester, Indiana to meet Reed and to pick up the uniloader and the bucket and cab for the payloader. Again, Johnson's opinion was a shorthand rendition of facts known to him. The requirements of Fed.R.Evid. 701 were satisfied.

George Vitko expressed his opinion that Thompson was involved in attempting to sell him the payloader. Vitko testified that Thompson and Johnson were present and both made comments about the machine, but Vitko decided not to buy because he thought "there was something phony about it." He described the discussions with Thompson. Vitko was aware that the identification plate was off the machine and found that Johnson had no bill of sale. He

mentioned those facts to Thompson and Thompson replied that it was a cheap machine. Again, there is substantial factual background to support the opinion and the opinion is a shorthand rendition of the total situation as observed by Vitko.

■ We cannot conclude that the district court erred in admitting the opinion testimony. The opinions were rationally based on each witness's perception and were helpful to a clear understanding of such witness's testimony and the determination of the facts in issue.

## II.

■ Thompson argues that the critical testimony from witnesses Johnson and Mathis did not come directly from their independent testimony but from reference to trial transcripts to refresh their recollection, or by the government simply reading the earlier transcript of testimony to the witness and forcing the witness to adopt the testimony. Thompson argues that the government thus used the testimony of witnesses from prior trials as evidence against him at this trial. We reject Thompson's argument. The transcripts were properly used either to refresh the recollection of the witness or to impeach the witness. The testimony can best be considered in several categories.

### A. *Refreshing Recollection by Showing Transcript.*

■ In the first category the witness answered that he did not know or was uncertain of the answer to a particular question. He was then shown the transcript of one of the earlier trials in which he had testified. After reading his earlier testimony to himself without indicating to the jury the contents of the transcript, the witness answered the question on the basis of his refreshed recollection. Mathis so testified that he

unloaded one tractor at Morelli's and Thompson the other. Johnson similarly testified that Thompson's initial visit to North Dakota occurred some time between late August and September 15, 1979; that he and Thompson discussed the type of farm equipment used in the area; that he told Thompson of his friend's desire for a payloader; and that, in a telephone conversation shortly before the machinery arrived, Thompson told him that a crawler and a tractor were coming.

With respect to these particular items of testimony, after the recollection of the witness had been refreshed, he gave testimony based upon the refreshed recollection. This then became the testimony, as "present recollection revived." The transcript of the earlier trial, "past recollection recorded," was used only to refresh recollection and was not evidence in the case. *United States v. Riccardi,* 174 F.2d 883, 888–89 (3rd Cir.), *cert. denied,* 337 U.S. 941, 69 S.Ct. 1519, 93 L.Ed. 1746 (1949); 3 J. Wigmore, *Evidence* § 758 (Chadbourn rev. 1970). These were situations in which a writing was used to refresh the memory of the witness "for the purpose of testifying ... while testifying." *See,* Fed.R.Evid. 612. The court ascertained that the transcripts of the earlier trials were available to Thompson. Thompson was given the right to cross-examine with the transcript and to introduce in evidence those portions which related to the testimony of the witness. Fed.R.Evid. 612 was thus observed.

### B. *Transcript Shown to Witness and then read to Witness in Questions.*

■ There were a number of instances in the testimony where the witness either failed to recall the answer to a particular question, or made an answer that was subject to direct contradiction by his testimony from an earlier trial.[2] The witness would

---

**2.** Whether there was a claimed failure to remember or direct contradiction is not material. As this court observed in *United States v. Rogers,* 549 F.2d 490 (8th Cir.1976), *cert. denied,* 431 U.S. 918, 97 S.Ct. 2182, 53 L.Ed.2d 229 (1977):

A claimed inability to recall, when disbelieved by the trial judge, may be viewed as inconsistent with previous statements when the witness does not deny that the previous statements were in fact made. Dean Wigmore supplies the reason:

then be shown the transcript. When it was apparent the transcript did not alter the witness's position, the earlier trial testimony was read aloud to the witness and the witness was asked whether he recalled making the statements.

An example of such interrogation with the witness Roland Mathis is as follows:

Q  Do you recall who took the payloader to Morelli's Distributors?

A  Not exactly who took it out there, no; but it was driven out there, and I wasn't there at the time. I went back to the arena, so just how it got there I don't know.

Q  Well—

A  (Interrupting)  It was driven to Morelli's, I presume, by probably Dale and Jim Thompson because it was at Morelli's.

Q  Mr. Mathis, I am going to show you another piece of transcript. I ask again just simply for you to read it to yourself.

.    .    .    .    .

Q  (By Mr. Hill)  I would ask you simply to refer to the portion of the transcript that I have marked and simply ask that you read it to yourself.

A  (Examining).

Q  Mr. Mathis, does that refresh your recollection with respect to the events of moving the payloader from Vitko Construction to Morelli's Distributors?

A  Yes.

Q  And I will ask you once again what you recall with respect to the movement of that machine from Vitko Construction to Morelli's Distributors?

A  According to that transcript there, Jim Thompson drove it to Morelli's.

Q  Does that refresh your recollection how it happened?

A  It could be. I can't say for sure whether he drove it or not. It is down there, but I don't know. I didn't write that, I couldn't say.

> [An] unwilling witness often takes refuge in a failure to remember, and the astute liar is sometimes impregnable unless his flank can be exposed to an attack of this sort. [footnote omitted]

[Thompson objected on the grounds that Mathis was not present when the machine was moved, that Mathis's testimony was different at the June trial, and that he (Thompson) did not have a copy of the June transcript. The district court overruled the objection and made sure that copies of both the April and June transcripts were available to Thompson.]

Q  (By Mr. Hill)  Mr. Mathis, I was just at the point of asking you whether or not you recall during the April, 1980, trial of yourself being asked the following questions and responding in the following manner:

Question: Well, after you had this discussion about whether you could store the John Deere at Morelli's, what, if anything, happened?

Answer: Jim Thompson drove the loader to Morelli's Distributing on the highway.

Question: And what did you do?

Answer: I rode with Dale and followed him.

Question: Followed Jim Thompson?

Answer: This is true.

Question: Did you go all the way back to Morelli's?

Answer: This is true.

Now, do you recall that that is the series of questions asked by your attorney, Mr. Nodland, and those are your responses?

A  I think so, yes.

Q  In referring to the June 2nd trial, Page 1427, were you asked the following questions and did you respond in the following manner:

Questio₁: Did there come a time when the loader was moved from Vitko's Construction Company to Morelli's Distributors?

Answer: At that time? [sic]

549 F.2d at 496. *See also,* 3A J. Wigmore, *Evidence* § 1043, at 1061 (Chadbourn rev. 1970).

Question: And who drove the payloader from the yard of Vitko Construction Company?

Answer: Thompson.

Do you recall giving those answers to those questions back in the June 2nd trial?

A  I believe so.

Q  So apparently having now had your recollection refreshed through these transcripts, you do recall Mr. Thompson drove the payloader from the Vitko Construction Company?

A  Yeah, probably did.  I am not positive, but he could have.

Q  Well, your recollection certainly would have been better back in April and June of this year?

A  Yes, could be.

Q  So your best recollection would be that that's the way it happened, is that correct?

A  Yes.

Here, the effort to refresh the recollection by showing the transcript in accordance with Fed.R.Evid. 612 failed and then, pursuant to the procedures of Fed.R.Evid. 613, a question was asked incorporating portions of the transcript.  While this was attempted impeachment under Rule 613, the witness recalled as his present recollection his prior statement.  His prior statement again became "present recollection revived."

There were two similar exchanges.  Mathis denied that Thompson participated in a conversation about newspaper articles concerning the stolen machines.  Witness Dale Johnson denied that Thompson had discussed farm equipment with him on Thompson's first trip to North Dakota.  In both instances the witness was shown the transcript, his recollection was not refreshed and questions were asked in which portions of the transcript were read to the witness.  In both instances the witness acknowledged the testimony in the earlier trial and concluded that this was his best

recollection.  Mathis remembered that Thompson did participate in the conversation.  Johnson remembered that Thompson had discussed farm equipment when he was in North Dakota.  The substance of the earlier testimony was thus adopted as present recollection revived.

In each instance the refreshment of recollection or impeachment was proper.  *See,* Fed.R.Evid. 612; Fed.R.Evid. 613.  The earlier testimony was in each instance adopted by the witness as his present testimony.  The testimony then would be given substantive effect.[3]

C.  *Admission of Earlier Trial Testimony Without Acceptance of Testimony at Trial.*

■ In one instance transcripts of testimony were shown to Mathis after he stated that he could not remember who gave him the serial number warranty plates.  His recollection was not refreshed and then portions of the transcript were read to him.  Mathis admitted giving the answers but did not admit that the answers were true.  After Mathis was shown the two transcripts, this exchange followed:

Q  And who was it, what is your best recollection of who it was that gave you the [serial number warranty] plates at this time?

A  One says Jim Thompson and the other one says I got them from Jim—or on the other I didn't know which one. [sic]

Q  Would you agree the following question was posed to you and the following answer was given by you in the 19—

A  (Interrupting)  Yes.

Q  Where did you get the plates?  Answer: Jim Thompson.

A  A little further back it says I wasn't sure.

Q  What is your recollection?

A  I don't know who gave me the plates.  I don't know—it was handed in

---

**3.** This would be true even prior to the enactment of Fed.R.Evid. 801(d)(1)(A) which gives substantive effect to prior inconsistent statements under certain circumstances.  4 J. Weinstein, *Evidence* ¶ 801(d)(1)(A)[02]; Fed.R.Evid. 801, advisory committee note.

the car—whose hand they were in, I couldn't tell you.

Q You did make, at least at one time, the assertion it was Jim Thompson?

A According to the way it is written.

Q Let me ask you this: Apparently Mr. Thompson and Mr. Johnson were both there?

A That's true.

Q In your mind were both of these individuals participating in the discussion?

A Not in the discussion, no. I talked to Dale.

Q In the movements of the transfer of the plates, in your mind were they both involved in the transfer of the plates?

A They were both there.

Q You, at least at one point, believed it was Mr. Thompson who gave you the plates?

A No, I can't say I did.

Q Did you read that question?

A I did not, you know, type that. I don't know where it came from. I can't swear he gave me those.

Q Did you make that answer to the question posed to you in April, 1980?

. . . . .

Q (By Mr. Hill) To conclude this area, Mr. Mathis, at one point did you indicate during your own trial to your own attorney that it was James Thompson that gave you the plates?

A That's what is written there, yes.

Q And how many plates did you receive?

A Two.

Here Mathis admitted making the earlier statement but did not acknowledge its truth while testifying. Mathis refused to adopt as trial testimony the earlier testimony that Thompson had given him the plates. He continued to insist that he could not recall who gave them to him. The testimony from his earlier trial served not only to impeach Mathis but under Rule 801(d)(1)(A) was admissible as substantive evidence. 4 J. Weinstein, *Evidence* ¶ 801(d)(1)(A)[03].

In this, as well as other instances, Mathis was a particularly recalcitrant, argumentative, and hesitant witness who had earlier been convicted as a result of the same occurrences for which Thompson was on trial.

■ The district court should have considerable discretion to determine whether evasive answers are inconsistent with statements previously given. *United States v. Rogers*, 549 F.2d 490, 496 (8th Cir.1976), cert. denied, 431 U.S. 918, 97 S.Ct. 2182, 53 L.Ed.2d 229 (1977). The court did not abuse its discretion here in view of Mathis's recalcitrance. *See, United States v. Insana*, 423 F.2d 1165 (2d Cir.), cert. denied, 400 U.S. 841, 91 S.Ct. 83, 27 L.Ed.2d 76 (1970). The April and June trials from which the earlier testimony under oath was taken were before the same district judge. Under the circumstances we cannot conclude that the court erred in allowing this interrogation.

D. *A Limiting Instruction was not Required.*

This court has discussed the use of prior inconsistent statements for purposes of impeachment. *United States v. Rogers*, 549 F.2d at 494–502. The first three requirements for use of such testimony, inconsistency, relevancy, and compliance with Rule 613, were satisfied in this case.

We asked the parties to brief the fourth requirement of *Rogers*, an instruction that the impeaching testimony is admissible for the limited purpose of impeachment and not as substantive evidence. No such instruction was given in this case, nor was it requested.

A limiting instruction was not required here because the prior inconsistent statement was given under oath subject to the penalty of perjury at a former trial. Fed.R. Evid. 801(d)(1)(A). This situation differs from that presented in *Rogers; United States v. Ragghianti*, 560 F.2d 1376 (9th Cir.1977); and *United States v. Palumbo*, 639 F.2d 123 (3d Cir.1981). The prior impeaching statements in *Rogers* and *Ragghianti* were extrajudicial statements made

to FBI agents. *Palumbo* involved an extra-judicial statement to a police officer. The impeaching statement in each of these cases was hearsay and therefore a limiting instruction was necessary. *Ragghianti* carefully distinguished between prior statements obtained from a witness by police in the course of a criminal investigation, and testimony given under oath in a formal proceeding.

In the case before us, we are dealing with the testimony of a witness in two earlier trials which involved the same set of circumstances and which were before the same judge. The testimony falls directly under Rule 801(d)(1)(A) which provides:

> (d) Statements which are not hearsay. A statement is not hearsay if—
>
> (1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition . . .

Mathis was present and subject to cross-examination, and the former trial testimony was inconsistent with his statement at trial. This testimony is admissible for purposes of impeachment and as substantive evidence.

In this latter respect there has heretofore been substantial controversy. 3A J. Wigmore, *Evidence* § 1018 (Chadbourn rev. 1970); 4 J. Weinstein, *Evidence* ¶ 801(d)(1)[01]. Before final adoption of Rule 801(d)(1)(A), this court followed the orthodox approach that would allow prior inconsistent statements to be admissible only for purposes of impeachment and not as substantive evidence. *United States v. Allsup,* 485 F.2d 287, 291 (8th Cir.1973); *Goings v. United States,* 377 F.2d 753, 761–762 (8th Cir.1967).

Professor Wigmore and other text writers argued for adoption of a rule that would allow such statements to be given affirmative testimonial value, following the decision of the Second Circuit in *United States v. De Sisto,* 329 F.2d 929, 933 (2d Cir.), *cert.*

*denied,* 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964). The more liberal theory was recommended to Congress by the advisory committee. After considerable debate in both houses, Rule 801(d)(1)(A) as set forth above was adopted. The rule provides that under limited circumstances, prior inconsistent statements are admitted as substantive evidence. *See* 4 J. Weinstein, *Evidence* 801–3 to 801–36. As stated in the notes following Rule 801: "Prior inconsistent statements traditionally have been admissible to impeach but not as substantive evidence. Under the rule they are substantive evidence." Fed.R.Evid. 801, advisory committee note.

Since passage of the rule, this court has considered the subparagraph of the rule relating to admissions by a party opponent, Rule 801(d)(2), and concluded that such admissions were admissible as substantive evidence. *United States v. Porter,* 544 F.2d 936, 938–39 (8th Cir.1976). We have also concluded that testimony before a grand jury fell within the subparagraph that we are here considering, Rule 801(d)(1)(A), and was therefore admissible as substantive evidence. *United States v. Long Soldier,* 562 F.2d 601, 605 (8th Cir.1977).

■ Because the testimony from the earlier trials was prior inconsistent testimony, either because the witness claimed an inability to recall or had testified in direct contradiction, it was admissible as substantive evidence and a limiting instruction was not required.

It should be observed that there was no introduction in evidence of the earlier testimony as such. There was simply a question asking the witness if the questions were asked and the answers given to establish a foundation for admission of the evidence of such testimony. Because Mathis admitted that such earlier testimony was given, introduction of extrinsic evidence of the earlier testimony was not required. Foundation questions incorporating testimony, given under oath in an earlier trial before the same district judge and with the witness present and available for cross-examination, were not improper.

■ Thompson also raises a question concerning constitutionality under *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). He concedes that the sixth amendment permits the use of earlier statements of the witness if the witness concedes making the statement and the defense has an opportunity to engage in full cross-examination at trial. These conditions were fully satisfied in this case and the constitutional arguments are without merit.

### III.

Thompson contends that testimony given by Danny Schatz was improper in two respects, that it was improper opinion testimony and that Schatz's memory was improperly refreshed.

Schatz was asked his opinion as to whether Johnson was working with anyone with respect to the machines. Schatz first was uncertain whether Johnson was working with someone else. To refresh his memory, Schatz was shown a memorandum prepared by an FBI agent concerning the agent's interview of Schatz. Schatz said the memorandum "jiggled my mind." Schatz answered that Johnson said he was working with Thompson.

■ The earlier conversations between Johnson and Schatz at which Thompson was present provided a factual foundation for the expression of Schatz's opinion. *See, United States v. Freeman,* 514 F.2d at 1191. At the time this testimony came into the case there was substantial testimony about the relationship between Johnson and Thompson.

■ Refreshment of recollection was also proper. The information in the memorandum became Schatz's present testimony because he adopted it as his present recollection revived. *United States v. Borelli,* 336 F.2d 376, 390–91 (2d Cir.1964); *Finnegan v. United States,* 204 F.2d 105, 115 (8th Cir.), *cert. denied,* 346 U.S. 821, 74 S.Ct. 36, 98 L.Ed. 347 (1953).

Schatz's statement appears to be hearsay. The record is not clear that the testimony was admissible under Fed.R.Evid. 801(d)(2)(E) as a statement by a coconspirator. Certainly the procedural steps for introduction of coconspirator statements were not followed. *See United States v. Bell,* 573 F.2d 1040 (8th Cir.1978); *United States v. Legato,* 682 F.2d 180 (8th Cir.1982). However, Schatz's statement was unresponsive to the prosecutor's question[4] and the evidence was cumulative.

■ Even if the admission of this or other evidence constitutes error, proper objections were not made and we cannot conclude that it had a substantial effect upon the rights of the defendant. *United States v. Grady,* 665 F.2d 831 (8th Cir.1981); Fed. R.Crim.P. 52(b). In so determining we may consider the strength of the prosecution's evidence. *Holloway v. Arkansas,* 435 U.S. 475, 488, 98 S.Ct. 1173, 1180, 55 L.Ed.2d 426, 437 (1978).

Our study of the record convinces us that the evidence of Thompson's guilt was overwhelming. Thompson's presence in North Dakota, conversations about a payloader and the arrival shortly thereafter of a payloader stolen but a few days earlier, Thompson's trip to the Chicago area where the stolen uniloader and its bucket and cab were procured, and Johnson's payment to Thompson for the uniloader is direct evidence of the most damaging kind.

Thompson complains of repeated use of transcripts from the earlier trials and of numerous lay witness opinions. He argues that this was the only substantial evidence against him. A review of the record demonstrates, however, that these were but isolated instances in a lengthy trial in which reluctant, uncooperative witnesses testified. The April and June trials, as well as the trial in this case, were before the same district judge, who was thus in a particularly good position to realize fully the impact of the testimony in the various trials. We

---

**4.** Schatz was asked whether he had formed an opinion on whether Johnson worked with someone else, based on "[Schatz's] contacts with Mr. Johnson and Mr. Thompson in the fall of 1979...." Schatz answered that he "was told" that Johnson worked with Thompson.

must reject Thompson's claim that opinion testimony and earlier trial testimony were improperly used.

In his pro se brief Thompson raises a number of other issues including prosecutorial overreach and misconduct, whether there was an informed waiver of sixth amendment rights to competent counsel, ineffective assistance of standby counsel, sufficiency of the evidence, and the applicability of the concurrent sentence doctrine. We have carefully considered these and all other allegations raised in Thompson's pro se brief and find them to be without merit.

Having carefully considered all of the claims of error, we affirm the judgment of the district court.

HEANEY, Circuit Judge, dissenting.

In this case, James Ray Thompson chose to represent himself. That was his right. The trial court and the prosecution were required to give him no less of a fair trial because he exercised that right. Because the trial court allowed the prosecution improper leeway in making out its case against Thompson, I would reverse the conviction and remand for a new trial.

The majority finds no error in the admission of lay opinion testimony by numerous prosecution witnesses regarding Thompson's complicity in this scheme for marketing stolen farm and construction equipment. I find prejudicial error. The Federal Rules of Evidence limit the admissibility of such lay opinions to those "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." Fed.R.Evid. 701. The opinions admitted in the instant case fail to meet the Rule 701 test both because of the insufficient foundations underlying the opinions and because of the absence of any nonprejudicial assistance given the jury by these opinions.

The majority adopts the "solid facts within [the witness's] personal knowledge" foundation requirement for a Rule 701 lay opinion. *United States v. Freeman,* 514 F.2d 1184, 1191 (10th Cir.1975). Here, the facts underlying the lay opinions admitted by the trial court are not as "solid" as the majority perceives. The witnesses, two of whom had previously been convicted for participation in this illegal scheme, were allowed to base their opinions concerning Thompson's involvement in essence on his presence during transactions among other parties. Moreover, the prosecution elicited the details of Thompson's presence by a series of leading questions which were totally improper on direct examination. Mere presence is not a sufficient foundation for lay opinion regarding an essential element of a crime, especially when the testimony concerning that presence is the result of improper direct examination of witnesses most likely to sway the jury. The cases relied upon by the majority, *United States v. McClintic,* 570 F.2d 685, 689–690 (8th Cir.1978) (witness allowed to give opinion on defendant's knowledge that goods had been fraudulently obtained based on witness's discussion of the fraudulent scheme with the defendant), and *United States v. Freeman, supra,* 514 F.2d at 1191 (loan officer allowed to give opinion on probable bank action if a borrower misrepresented the value of collateral based on review of financial documents and involvement in actual award of loan), do not suggest otherwise. The Federal Rules of Evidence were not premised on a doctrine of guilt by association.

In addition to insufficient foundations for these lay opinions, I have serious doubts that the opinions were "helpful" in making a correct and unprejudiced determination of a fact in issue in the instant case. This aspect of Rule 701 was not discussed in *United States v. McClintic, supra,* 570 F.2d at 690, save its conclusion that the opinion in that case was helpful and its quote of the "shorthand rendition" language in *United States v. Freeman, supra,* 514 F.2d at 1191. I fail to see how the opinions given in the present case were shorthand renditions of Thompson's criminal involvement in the marketing scheme based on personal knowledge of the testifying witnesses; rather, the opinions were speculations about a fact

easily proven by objective evidence—if the prosecution had such evidence. The opinion testimony here was a far cry from opinions concerning intoxication, speed, knowledge, probable action, or other facts regarding which objective evidence is often non-existent by virtue of the nature of the fact itself rather than the prosecution's failure to uncover what it wanted to find. Lay opinion can be helpful to the jury in these unusual cases. In the instant case, the opinions given by the witnesses, after a long line of leading questions, served only to prejudice Thompson's cause. *See* Fed.R. Evid. 403.

Even if the majority were to agree that the admission of lay opinion testimony in this case was erroneous, it would likely dismiss that error as an admission of cumulative evidence not objected to by Thompson and not harmful to him. Indeed, the majority, on this cumulative evidence ground, has chosen to overlook error in the admission of hearsay testimony by Danny Schatz, who stated that Dale Johnson "talked about" Thompson as Johnson's accomplice. In my opinion, rather than being cumulative evidence of Thompson's involvement, the lay opinion testimony, which I believe was erroneously admitted, and Schatz's hearsay testimony, which the majority agrees was admitted in error, was the evidence most likely to influence the jury in this case. The opinions of those admittedly involved in the scheme undoubtedly would carry great weight with the jury. Moreover, the hearsay statement regarding Thompson's alleged complicity with Johnson is devastating evidence in view of Johnson's prior conviction for his participation in the scheme. Under these circumstances, I would invoke the "plain error" doctrine and disregard Thompson's failure to object to these errors during trial. *See* Fed.R. Crim.P. 52(b). In order to reverse a decision based on the erroneous admission of evidence not objected to below, we need only find plain error, *i.e.,* "that which has a substantial effect upon the rights of a criminal defendant." *United States v. Grady,* 665 F.2d 831, 834 (8th Cir.1981). In view of the fact that Thompson was not represent-ed by counsel, we should be more liberal in applying this plain error rule. The clear prejudicial impact of the erroneous admission of lay opinions and hearsay testimony in the present case indicates the need to apply that rule here. I would recognize that need and remand for a new trial.