Daniel Steven NATKONG, Appellant,

v.

STATE of Alaska, Appellee.

No. A–5622.

Court of Appeals of Alaska.

Oct. 11, 1996.

Michael O'Brien, Juneau, for Appellant.

Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

### OPINION

MANNHEIMER, Judge.

Daniel Steven Natkong appeals his convictions for first-degree sexual abuse of a minor, AS 11.41.434(a)(1). We affirm.

In April 1994, Natkong was indicted for sexually abusing his daughter, D.N., during the period of March 1992 through January 1994. D.N. was between five and seven years old during this time. The State's case at grand jury was founded on the testimony of three witnesses.

D.N.'s mother, Ernestine Natkong, testified that she and Natkong separated in early February 1994. A short time later, Mrs. Natkong informed D.N. that Natkong was going to move back into the home. Upon hearing this news, D.N. "freaked". D.N. told her mother that "if [she] didn't divorce [Natkong], that she would never forgive [her]." D.N. then revealed that she had been sexually abused by Natkong:

> MRS. NATKONG: [D.N.] told me that when I would go out to drink, that her dad would ... drink his whiskey, and about 3:00, 4:00 or 5:00 in the morning, he would go in my bedroom when my three kids were sleeping, but [D.N.] would never sleep because she knew that he was going to come in there. And he would go in there and he would take her either by her hand, or one time he drug her from my bedroom to his bedroom, because we slept in separate bedrooms for two years. He has moved into his own room. And she said he tied her—tied her hands, both her hands with a handkerchief, and tied her mouth with a handkerchief, and he would start off on the front and he would finish in the back.
>
> PROSECUTOR: Okay. By "front", you mean her vagina?
>
> MRS. NATKONG: Yes.
>
> PROSECUTOR: And [by] "back", you mean her anus?     .
>
> MRS. NATKONG: Yes.

Mrs. Natkong also testified that D.N. had been experiencing problems with her bowels (soiling her pants). She told the grand jury that D.N.'s bowel problems began when D.N. was five years old, apparently around the same time that the sexual abuse began. Mrs. Natkong also testified that she had found Natkong lying in bed with D.N. several times. Whenever she approached Natkong to talk about this, "he would get really upset" and would tell her that she had "a sick mind".

Debra Downs, a state social worker, interviewed D.N. after receiving the report that D.N. had been sexually abused. Downs went to D.N.'s home accompanied by Kake Police Chief Frank Hughes. D.N. told Downs that her father would sexually abuse her on the nights when her mother went out to get drunk. According to D.N., the abuse had taken place in every room of the house except her mother's room. Natkong would put his fingers and his penis in D.N.'s vagina and anus. D.N. also told Downs that her father would tie a handkerchief across her mouth to muffle her screams.

Dr. Diane Liljegren, a physician, examined D.N. after the report of sexual abuse was received. When Dr. Liljegren asked D.N.'s mother to leave the examination room (her standard procedure in such cases), D.N. became "panic stricken"; the only way to keep D.N. calm enough to allow the exam to go forward was to allow Mrs. Natkong to remain in the room. Liljegren testified that D.N. was distraught and crying during the examination of her perineal area. There was no visible trauma to D.N.'s vaginal area, but it looked to Liljegren that D.N.'s hymen was not intact.

When Dr. Liljegren was checking D.N.'s hymen, D.N. reacted dramatically to the intrusion of the Q-tip. According to Dr. Liljegren,

I used a Q–Tip to try to ... separate the tissues and see what was going on, and I touched her with the Q–Tip and—let me get the exact words—and she just screamed out, "That's what it felt like when Daddy touched me down there."

Liljegren also found scarring inside D.N.'s anus, which she said was "pathognomonic of something being inserted into [the] anus."

At the end of the examination, Liljegren reminded D.N. of what she had said about her father's touching her. Liljegren then asked D.N., "Did Daddy ever touch you any farther inside than that?" D.N. responded that she did not know. Liljegren then reminded D.N. of the anal examination, during which Liljegren had not inserted anything into D.N.'s body. She asked D.N. "if Daddy touched her where I did, or farther inside?" According to Liljegren, D.N. indicated "with an emphatic nod that it was farther inside that her daddy had touched her." Liljegren also testified that D.N.'s reported bowel problems were "very consistent with sexual abuse", especially sodomy.

The State did not call D.N. to testify at grand jury. The prosecutor explained to the grand jury that D.N.'s prior statements about the abuse would be presented under the authority of Alaska Criminal Rule 6(r)(2). Rule 6(r)(2) declares that, in a prosecution for sexual assault or sexual abuse of a minor,

hearsay evidence of a statement related to the offense ... made by a child who is the victim of the offense may be admitted [at] grand jury if

(i) the circumstances of the statement indicate its reliability;

(ii) the child is under 10 years of age when the hearsay evidence is [introduced];

(iii) additional evidence is introduced to corroborate the statement; and

(iv) the child testifies at the grand jury proceeding or the child will be available to testify at trial.

Based on the foregoing evidence, the grand jury indicted Natkong. However, when D.N. took the stand at Natkong's trial, she claimed that she did not remember being sexually abused by her father.

At the beginning of direct examination, D.N. answered some two dozen background questions about her age, her family, her hometown, and how she had traveled to Petersburg to attend the trial. But when the prosecutor asked D.N. if she knew her father's first name, she first refused to answer, and then she responded "No." The prosecutor asked D.N. more questions about her father; D.N. would not respond to these questions except to say, "I don't know" or variations of this answer. The prosecutor then asked the trial judge's permission to confront D.N. with the prior statements she had made about the sexual abuse. This request was granted.

The prosecutor first asked D.N. about statements she had made to Debra Downs, the social worker:

PROSECUTOR: Do you remember Debbie? Do you remember talking to Debbie? Do you remember a lady named Debbie?

D.N.: Yes.

PROSECUTOR: And do you remember talking to her when you were with Frank [Hughes], with—Frank, he was there, right? Do you remember that? If you don't remember, you can tell me. You don't remember if Frank was there?

D.N.: No.

PROSECUTOR: You don't remember. Okay. When you talked to Debbie, do you remember talking to her about your dad touching you? Do you remember that? Do you understand the question? All I want is a "yes" or "no". Do you remember talking to her about that?

D.N.: No.

D.N. went on to declare that she did not remember any drawings she and Downs had made, nor did she remember ever telling Downs that Natkong had touched her "private parts". When asked whether she remembered her father ever touching her private parts, D.N. responded "No." When the

prosecutor showed D.N. the drawings Downs had made during their interview, D.N. indicated she did not remember ever seeing the drawings before nor did she remember Downs drawing them.

As the examination continued, the prosecutor asked D.N. directly whether her father "ever touched [her] in a way that [she] didn't want him to?" When D.N. did not immediately respond, the prosecutor asked if she understood the question; D.N. answered "Yes." When D.N. still did not respond to the question, the prosecutor repeated it, and then asked, "Do you understand that question?", to which D.N. replied, "I'm trying to remember." D.N. never answered the question.

The prosecutor moved on, asking D.N. if she knew who Ann Jackson was.[1] D.N. responded "Yes"—that she knew that Jackson lived in Kake. When asked if she remembered talking to Jackson about "your dad touching you", D.N. responded "No", repeating the answer when the prosecutor repeated the question. When the prosecutor asked D.N. if she remembered talking to a doctor in Sitka or seeing a doctor in Ketchikan (i.e., Dr. Liljegren), D.N. responded "No" to both questions.

Natkong's attorney then cross-examined D.N.. The defense attorney began by asking D.N. basic questions about her trip from Kake to Petersburg; D.N. responded to these questions with short answers, usually "Yes" or "No". The defense attorney then asked D.N. where she lived in Kake, who lived with her, and whether she lived in a house or apartment. D.N. was responsive to all of these questions. The defense attorney then asked D.N. whether she remembered talking to Ann Jackson before coming to Petersburg; D.N. replied that she did not remember. The questioning then shifted to whether "some people talk[ed] to you about coming here?", to which D.N. responded

"Yes". When the defense attorney asked if Mr. Herren (the prosecutor) had talked to D.N. about coming, she responded "I don't remember". When asked if she remembered her mom talking to her about coming, D.N. responded "Yes". When posed the same question about "Mr. Hughes" (Kake Police Chief Frank Hughes), D.N. indicated she could not remember. When asked if "Janice" (a paralegal with the district attorney's office) had talked to her, D.N. answered "Yes", but, in follow-up questions, D.N. claimed not to know where Janice worked, or if Janice worked with Mr. Herren.

The defense attorney then completely switched gears. She asked D.N. if she liked watching movies, and what her favorite movie was. D.N. was responsive to these questions.[2] The defense attorney then asked D.N., "Are there any scary movies that you've seen?" D.N. responded "Yes". The attorney pursued this line of questioning, asking D.N. to describe a scary movie she had seen "about aliens that took someone into space". D.N. was responsive to this line of questioning. When the defense attorney asked D.N. whether the events in the movie which D.N. described (aliens taking someone into space) were "true", D.N. responded, "It said that it was true." When the defense attorney asked, "Who said it was true?", D.N. responded, "The movie did." D.N. then indicated she did not think it was true. The defense attorney asked a few more questions about the movie and whether D.N. sometimes watched scary movies at home; D.N. responded to all these questions. At this point, the defense attorney abruptly ended the cross-examination.

Following the cross-examination of D.N., the prosecutor announced that he intended to introduce D.N.'s prior statements to her mother, to Debra Downs, to Ann Jackson, and to Dr. Liljegren. For admission of this

---

1. Ann Jackson is referred to here, and also several times during the parties' argument over the admissibility of D.N.'s hearsay statements, but she is never mentioned in either party's brief on appeal. At one point in the trial proceedings, the prosecutor indicated that he intended to call Jackson as a witness. But because Natkong asked for transcription of only a small portion of the trial (basically, D.N.'s testimony and Judge

Carpeneti's ensuing ruling on the admissibility of D.N.'s prior statements), we are unable to ascertain if Jackson testified at Natkong's trial.

2. D.N. indicated that she does like to watch movies and that her favorite movie is "Beethoven II".

hearsay, the prosecutor relied on Alaska Evidence Rule 801(d)(1)(A), which declares that, despite the normal rule against hearsay, a witness's prior inconsistent statements are admissible for the truth of the matters asserted in those statements.[3]

Natkong's attorney opposed the introduction of this evidence. The defense attorney pointed out that Evidence Rule 801(d)(1)(A) allows the introduction of a person's out-of-court statements only if "[t]he declarant testifies at the trial or hearing". The defense attorney argued that, because of D.N.'s repeated refusals to answer and her repeated answers of "I don't remember" and "I don't know", D.N. had not meaningfully appeared as a witness, and thus her prior statements could not be introduced under Evidence Rule 801(d)(1)(A).

The defense attorney also argued that, because D.N. was not available as a witness, her statements to her mother, to Debra Downs, and to Dr. Liljegren should not have been introduced at grand jury. Natkong's attorney pointed out that Criminal Rule 6(r)(2)(iv) allows introduction of a child-victim's hearsay only if "the child testifies at the grand jury proceeding or the child will be available to testify at trial". D.N. had not testified at grand jury, and Natkong's attorney argued that her problematic testimony at trial did not qualify her as an "available" witness.

Superior Court Judge Walter L. Carpeneti ruled that D.N. had been available for cross-examination and thus D.N.'s prior statements were admissible as inconsistent statements under Evidence Rule 801(d)(1)(A). The judge viewed D.N.'s answers as the equivalent of her asserting that "none of this ever happened", and thus her prior statements (that she had been sexually abused by her father) were inconsistent with her trial testimony. Judge Carpeneti further found that Natkong's failure to press D.N. on cross-examination had been tactical—that the defense attorney had chosen to question D.N. solely upon innocuous subjects rather than risk an unfavorable answer to a direct question about whether the sexual abuse had occurred.

■ Regarding Natkong's alternative argument that the indictment should be dismissed because D.N. was not available as a trial witness for purposes of Criminal Rule 6(r)(2)(iv), Judge Carpeneti told the parties that "if a motion to dismiss is going to be revisited, it ought to be revisited after trial". Natkong's attorney responded, "[I]f the court decides to allow the [hearsay] statements in, I would make that motion to dismiss and follow the court's order in terms of renewing that [motion] after trial."

On appeal, Natkong argues that Judge Carpeneti implicitly denied his Rule 6(r)(2) motion; he asks this court to reverse Judge Carpeneti's ruling and throw out the indictment. However, as the transcript makes plain, Judge Carpeneti did not rule on Natkong's motion. Instead, the judge directed Natkong to renew the motion after trial if he wished to pursue the issue. Because Natkong has provided us with such an abbreviated transcript of his trial, we have no record of whether Natkong renewed his motion at the close of trial as Judge Carpeneti requested. Likewise, we have no record of any ruling by Judge Carpeneti on Natkong's motion (assuming that Natkong did renew it).

■ It is the appellant's burden to demonstrate that an asserted point of error was preserved in the trial court and that the trial judge did in fact rule adversely to the appellant. The record that Natkong has designated does not demonstrate these essential elements of his appellate claim. For these reasons, we find that Natkong's Rule 6(r)(2) claim is waived. *See* former Appellate Rule 210(d); *Ketchikan Retail Liquor Dealers Ass'n v. State, Alcoholic Beverage Control Bd.*, 602 P.2d 434, 438–39 (Alaska 1979) (a party's failure to designate a record to support the party's claims justifies a reviewing court in deciding those claims against the party); *Whittier v. Whittier Fuel & Marine Corp.*, 577 P.2d 216, 223 n. 26 (Alaska 1978) (a reviewing court will not consider trial ex-

---

**3.** Even before the Alaska Supreme Court's adoption of the current Rules of Evidence, Alaska law allowed a witness's prior inconsistent statements to be used as substantive evidence. *See Beavers v. State*, 492 P.2d 88, 94 (Alaska 1971).

hibits if the exhibits are not part of the designated record on appeal). *Cf. McBride v. State,* 368 P.2d 925, 927 n. 11 (Alaska 1962) (when the appellant omits portions of the record adverse to his claims, a reviewing court retains the discretion to examine and rely upon those omitted portions of the trial court proceedings so as to avoid rewarding the appellant for failing to comply with the obligation to include "all matters ... essential to a decision of the questions presented by the appeal").

■ We turn now to the issue of whether D.N.'s prior statements were admissible under Evidence Rule 801(d)(1)(A). Rule 801(d)(1)(A) provides that a hearsay statement is admissible for the truth of the matter asserted if "[t]he declarant testifies at the trial ... and the statement is inconsistent with the declarant's testimony." The underlying question here is whether D.N. meaningfully "testified" for purposes of Rule 801(d)(1)(A) when she was examined at Natkong's trial.[4]

Natkong agrees with Judge Carpeneti's conclusion that D.N.'s ostensible lack of memory was, in truth, a refusal to answer questions. Natkong claims than D.N.'s refusal to answer questions deprived him of the ability to cross-examine her. For this reason, Natkong argues, D.N. did not really "testify" at his trial, and therefore her prior statements concerning the sexual abuse should not have been admitted.

This court faced a similar issue in *Van Hatten v. State,* 666 P.2d 1047 (Alaska App. 1983). The defendant in *Van Hatten* was accused of sexually abusing his stepdaughter. The stepdaughter had detailed the sexual abuse in her grand jury testimony, but her trial testimony was quite different. The stepdaughter "answered preliminary ques-

tions without reluctance[,] but when questioning turned to the specific occurrences [at issue], she maintained that she was unable to recall most details." *Id.* at 1049. Over defense objection, the prosecutor then introduced the stepdaughter's grand jury testimony, as well as statements she had given to a police investigator, as inconsistent statements under Evidence Rule 801(d)(1)(A). *Id.*

Van Hatten argued that his stepdaughter's "lapses of memory" at trial "were not inconsistent with her prior [statements], since they effectively constituted a refusal to answer and did not amount to testimony." Van Hatten also argued that that his stepdaughter's "unwillingness or inability to recall the details of the alleged assault rendered her functionally unavailable for cross-examination". *Id.*

This court, after reviewing state and federal precedents, concluded:

> [When] a witness deliberately seeks to avoid testifying by claiming loss of memory in response to specific questions, prior statements of the witness relating to the subject matter of the question are ["]inconsistent["] within the meaning of Evidence Rules 613 and 801(d)(1)(A).

*Van Hatten,* 666 P.2d at 1051. Since the time *Van Hatten* was decided, federal precedent even more strongly supports this view. *See United States v. Bigham,* 812 F.2d 943, 946 (5th Cir.1987); *United States v. Williams,* 737 F.2d 594, 608 (7th Cir.1984), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985); *United States v. Baker,* 722 F.2d 343, 348–49 (7th Cir.1983), *cert. denied,* 465 U.S. 1037, 104 S.Ct. 1312, 79 L.Ed.2d 709 (1984); *United States v. Russell,* 712 F.2d 1256, 1258 (8th Cir.1983); *United States v. Thompson,* 708 F.2d 1294, 1303 (8th Cir.1983). *See also* Jack B. Weinstein and Margaret A. Berger, *Weinstein's Evidence*

---

4. Conceptually, two questions must be answered to determine the admissibility of this evidence: (1) were D.N.'s prior statements admissible under the Rules of Evidence despite their hearsay nature? and (2) would admission of D.N.'s prior statements violate Natkong's constitutional right to confront the witnesses against him? However, in Natkong's case it appears that the answer to the first question (whether D.N.'s statements were admissible under Evidence Rule 801(d)(1)(A)) supplies the answer to the second

question. The Alaska Supreme Court has ruled that admission of a witness's prior inconsistent statements does not abridge a party's right of cross-examination, *Beavers,* 492 P.2d at 93, and the supreme court has also ruled that if a witness is available for cross-examination, then introduction of the witness's prior inconsistent statements does not offend Alaska's confrontation clause. *Lemon v. State,* 514 P.2d 1151, 1153–54 (Alaska 1973).

(1990), ¶ 801(d)(1)(A)[04], pp. 801–156 to 801–157.[5]

For these reasons, we agree with Judge Carpeneti that D.N.'s prior statements describing the sexual abuse were admissible under Evidence Rule 801(d)(1)(A).

On a related matter, we conclude that the record supports Judge Carpeneti's finding that Natkong's relatively short cross-examination of D.N. was the result, not of D.N.'s unwillingness to answer questions, but of the defense attorney's tactical choice not to ask D.N. any question dealing with the substance of the charges. *See Bodine v. State,* 737 P.2d 1072, 1075 (Alaska App.1987).

On direct examination, D.N. asserted that she did not recall being sexually abused. This assertion was facially implausible, given D.N.'s earlier descriptions of the abuse to her mother and to Debra Downs, and D.N.'s statements about the abuse to Dr. Liljegren. At the same time, D.N. readily answered the prosecutor's background questions, as well as the questions on other subjects put to her by Natkong's attorney during cross-examination. Under these circumstances, Judge Carpeneti could reasonably conclude that Natkong's attorney chose not to confront D.N. with a direct question about the sexual abuse.

■ As an alternative ground for our disposition of this issue, we note that even if D.N. was not available for cross-examination (so that her prior statements were not admissible under Evidence Rule 801(d)), there would still be colorable arguments that some of D.N.'s prior statements were admissible under Alaska Evidence Rule 804(b)(5). *See Matter of T.P.,* 838 P.2d 1236 (Alaska 1992). Moreover, some or all of the statements that D.N. made to medical care providers may have been admissible under Evidence Rule 803(4). Natkong's designation of record does not include the testimony of any trial witness except D.N.. That is, this court does not have the transcript of any of the hearsay testimony that Natkong now claims was introduced in violation of the rules of evidence. We do not know what hearsay statements were introduced, nor can we determine whether independent grounds exist for the introduction of some or all of this evidence.

■ It is an appellant's responsibility to present this court with a record sufficient to allow meaningful review of his or her claims. If we had not been able to resolve Natkong's claims on strictly legal grounds, we would have found them waived. *See* former Appel-

---

5. We also note the Supreme Court's decision of a related issue in *United States v. Owens,* 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988). In *Owens,* the issue was the admissibility of an assault victim's prior statement identifying the defendant as the perpetrator of the assault; at trial, because of brain injuries, the victim genuinely could not remember the identity of his attacker. The trial judge ruled that the victim's prior identification was admissible under Federal Evidence Rule 801(d)(1)(C), which allows introduction of a witness's prior statement identifying the perpetrator of a crime if the witness is "subject to cross-examination concerning the statement". The defendant argued on appeal that the victim had not been "subject to cross-examination" because the victim no longer remembered the basis for the earlier identification.

The Supreme Court held that, because the assault victim had testified at trial (even though concededly he did not remember the assault), the prerequisites of Evidence Rule 801(d)(1)(C) had been met—that is, the assault victim had been "subject to cross-examination". Despite the dif-

ficulty of cross-examining a witness who can not remember the incident being litigated, the Court adopted the view urged by Justice Harlan's concurrence in *California v. Green,* 399 U.S. 149, 188, 90 S.Ct. 1930, 1951, 26 L.Ed.2d 489 (1970), that the Confrontation Clause "guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way". *Owens,* 484 U.S. at 559, 108 S.Ct. at 842 (citations omitted).

Justice Brennan, dissenting in *Owens,* concluded that the witness's prior statements should not have been admitted when the witness had true memory loss. However, he was careful to distinguish cases where

witnesses asserting a memory loss ... do so under circumstances that suggest bias or ulterior motive; in [such cases], ... the witness' partial memory or self-interest in claiming a complete memory loss will afford the factfinder an adequate basis upon which to evaluate the trustworthiness of [a witness's] out-of-court statement.

*Owens,* 484 U.S. at 570–71, 108 S.Ct. at 848 (Brennan, J., dissenting).

late Rule 210(d); *Ketchikan Retail Liquor Dealers Ass'n,* 602 P.2d at 438–39; *Whittier Fuel & Marine Corp.,* 577 P.2d at 223 n. 26.

The judgement of the superior court is AFFIRMED.